WEBSTER BANK *v.* LORNA T. OAKLEY ET AL.
(SC 16851)

Sullivan, C. J., and Borden, Norcott, Katz and Zarella, Js.

Argued January 9—officially released September 2, 2003

*Kirk D. Tavtigian, Jr.*, for the appellant (named defendant).

*Felix J. Springer*, with whom was *Jennifer L. Sachs*, for the appellee (plaintiff).

*Thomas Behrendt* filed a brief for Advocacy Unlimited, Inc., et al. as amici curiae.

*Opinion*

NORCOTT, J. The named defendant, Lorna T. Oakley,[1] appeals[2] from a judgment of strict foreclosure rendered by the trial court in favor of the plaintiff, Webster Bank. In this appeal, the defendant claims that the trial court improperly concluded that: (1) the plaintiff clearly and unequivocally had exercised its option, under the mortgage, to accelerate the defendant's loan; and (2) the federal Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., the federal Fair Housing Amendments Act of 1988 (FHAA), 42 U.S.C. § 3601

---

[1] Although VI West Condominium Association, Inc., a subordinate lienholder, also was named as a defendant in this case, it is not involved in this appeal. Accordingly, all references herein to the defendant are to Lorna T. Oakley.

[2] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

et seq.,[3] and the state fair housing laws, General Statutes § 46a-64b et seq., do not require a bank, which is foreclosing on a mortgage loan that it has serviced, to accommodate a disabled mortgagor's inability to make her loan payments. We disagree with the defendant, and we affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. In April, 1993, the defendant executed a thirty year mortgage deed and note on her condominium unit with a predecessor in interest of the plaintiff.[4] The principal amount of the mortgage was $70,000, with a monthly payment of $495.46. The mortgage agreement contained an acceleration clause that delineated a procedure to be followed in the event of default by the borrower.[5] It also contained a nonwaiver

---

[3] The Fair Housing Amendments Act of 1988 (FHAA), 42 U.S.C. § 3601 et seq., "extended the Fair Housing Act's [FHA] principle of equal opportunity in housing to individuals with handicaps." *Salute* v. *Stratford Greens Garden Apartments*, 136 F.3d 293, 299 (2d Cir. 1998). Although the parties refer to these amendments in their briefs as the FHA, in this opinion we choose to follow the federal courts and refer to the federal statutes proscribing disability-based discrimination in housing as the FHAA. See, e.g., id.; *Shapiro* v. *Cadman Towers, Inc.*, 51 F.3d 328, 333 (2d Cir. 1995).

[4] The plaintiff's predecessor in interest was the Bristol Mortgage Corporation, a wholly owned subsidiary of the Bristol Savings Bank. In 1995, the Bristol Savings Bank merged with the plaintiff. With the merger, the plaintiff acquired all of the assets of the Bristol Savings Bank. These assets included all shares of, and assets owned by the Bristol Mortgage Corporation, which no longer is in existence and has no interest in the debt between the plaintiff and the defendant.

[5] The mortgage's acceleration clause provided in relevant part: "Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument . . . . The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the Notice, Lender at its option may require immediate payment in full

clause, which provided that "[a]ny forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy."

The defendant had worked as a social worker for the Connecticut department of children and families until March, 1999. In March, 1999, she stopped working because she had suffered from significant psychiatric disabilities, including severe depression, which rendered her unable to perform her work duties. She then took unpaid medical leave from her employment. Consequently, in September, 1999, the defendant defaulted on her mortgage obligations. At that point in time, she owed the plaintiff $2885.32 for payments past due since June of that year.

In September, 1999, the plaintiff sent to the defendant a default and cure letter dated September 13, 1999. This letter informed her that she had until October 13, 1999, to pay the total past due amount. The letter warned the defendant that if she did not pay the total amount due by October 13, the entire mortgage balance would be accelerated.[6] Subsequently, on October 14, 1999, the plaintiff sent another letter to the defendant advising her that, because it had not received the requested payment, the plaintiff considered the debt accelerated, and referred the matter to its attorney for collection.

Thereafter, the plaintiff's attorney sent to the defendant a letter dated October 19, 1999, informing her that she had until October 27, 1999, to cure the default by

of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph . . . including, but not limited to, reasonable attorney's fees and costs of title evidence."

[6] The letter explained acceleration to the defendant as "the entire principal balance, together with any accrued interest, late charges, escrow deficiencies, and/or legally collectible expenses will be immediately due and payable."

paying the amount owed, which at that time was $3501.09. The letter warned that failure to cure the default by that time potentially would result in foreclosure. That letter contained a clause stating that "[n]othing contained in this letter shall be deemed to be a waiver of any of the [plaintiff's] rights, remedies, or recourses available to it under the Note, the Mortgage, or any other documents executed with respect to this loan."

Subsequently, on November 17, 1999, the plaintiff filed this action against the defendant seeking foreclosure of the mortgage, immediate possession of the mortgaged premises, a deficiency judgment, and other equitable relief. As special defenses, the defendant asserted, inter alia, that the plaintiff was barred from foreclosure because: (1) the letters from the plaintiff and its attorney had failed to provide her with proper notice of the default and acceleration; and (2) the plaintiff, by not making a reasonable accommodation for the defendant's disabilities, had denied and interfered with her right to live in her dwelling under the FHAA, the ADA and § 46a-64b et seq. The defendant also sought recoupment and setoff, and she counterclaimed for damages on these, and other, grounds.

The plaintiff thereafter moved for summary judgment of strict foreclosure, which the trial court granted, over the defendant's objection, as to liability only.[7] In its memorandum of decision, the trial court concluded that none of the subsequent communications to the plaintiff from the defendant constituted a waiver of the default and cure notice that had been communicated to her in

---

[7] The trial court also ordered summary judgment in favor of the plaintiff on the special defenses pleaded in the defendant's answer, as well as her counts seeking recoupment, setoff and damages.

the original September, 1999 letter.[8] The trial court also concluded that the reasonable accommodations provisions of the FHAA and § 46a-64b et seq., as well as the ADA, were not applicable to the enforcement of a mortgage. The trial court based its conclusion on the language of the statutes, and what it determined was the absence of any case law indicating that the various antidiscrimination statutes apply to mortgage servicing and enforcement. The court concluded that "it does not appear that these statutes require any conduct on the part of the plaintiff." This appeal followed.

Before we address the defendant's specific claims on appeal, we first set forth the standard of review of a trial court's decision granting summary judgment, which is applicable to all of the defendant's claims on appeal. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Citations omitted; internal quotation marks omitted.) *LaFlamme* v. *Dallessio*, 261 Conn. 247, 250, 802 A.2d 63 (2002).

---

[8] In a subsequent articulation of its decision, the trial court emphasized that the October 19, 1999 letter from the plaintiff's counsel specifically advised the defendant that nothing contained therein constituted a waiver of the plaintiff's rights and remedies under the mortgage and note.

I

## THE PLAINTIFF'S CLEAR AND UNEQUIVOCAL EXERCISE OF ITS OPTION TO ACCELERATE THE MORTGAGE LOAN

The defendant's first claim presents a threshold issue in this appeal. The defendant contends that the trial court improperly concluded that the series of three letters sent by the plaintiff and its attorney constituted the requisite clear and unequivocal exercise of the mortgage's acceleration option. Specifically, the defendant claims that these letters do not constitute a clear and unequivocal exercise of the plaintiff's right to accelerate because, after she had received a letter from the plaintiff informing her that the loan had been accelerated, she then received a subsequent communication from the plaintiff's attorney that was phrased as a default and cure letter. The defendant, accordingly, contends that the loan was not accelerated properly because she never had received any communication of acceleration following her receipt of the default and cure letter from the plaintiff's attorney, which she claims the trial court improperly ignored.[9]

The plaintiff contends, in response, that the trial court concluded correctly that the plaintiff clearly and unequivocally had accelerated the loan because: (1) under the Appellate Court's decision in *Northeast Savings, F.A.* v. *Scherban,* 47 Conn. App. 225, 227–28, 702 A.2d 659 (1997), cert. denied, 244 Conn. 907, 714 A.2d 2 (1998), so long as the plaintiff satisfied its notice obligations under the mortgage when it initially had accelerated the loan, the subsequent communications from its attorney were irrelevant; and (2) under this

---

[9] The defendant also contends that the default and cure letter from the plaintiff's attorney did not comply properly with the prerequisites for foreclosure set forth in the mortgage because it provided less than thirty days to cure the default.

court's decision in *Christensen* v. *Culaia*, 211 Conn. 613, 619–21, 560 A.2d 456 (1989), the mortgage's non-waiver clause precluded any subsequent inconsistent conduct by the plaintiff, or its attorney, from being construed as a waiver of its right to accelerate the loan. We conclude that the trial court properly determined that the communications from the plaintiff and its attorney to the defendant constituted a clear and unequivocal exercise of the plaintiff's right to accelerate the defendant's mortgage loan.

"Notices of default and acceleration are controlled by the mortgage documents. Construction of a mortgage deed is governed by the same rules of interpretation that apply to written instruments or contracts generally, and to deeds particularly. The primary rule of construction is to ascertain the intention of the parties. This is done not only from the face of the instrument, but also from the situation of the parties and the nature and object of their transactions. . . . A promissory note and a mortgage deed are deemed parts of one transaction and must be construed together as such." (Citation omitted; internal quotation marks omitted.) *Citicorp Mortgage, Inc.* v. *Porto*, 41 Conn. App. 598, 602, 677 A.2d 10 (1996).

We note that, under the terms of the mortgage in the present case, acceleration is an optional remedy in the event of default by the borrower. See footnote 5 of this opinion. Accordingly, the rule articulated by the Appellate Court in *City Savings Bank of Bridgeport* v. *Dessoff*, 3 Conn. App. 644, 649, 491 A.2d 424, cert. denied, 196 Conn. 811, 495 A.2d 279 (1985), is applicable. In *City Savings Bank of Bridgeport*, the court concluded that "[t]he general rule is that where the acceleration of the maturity of a mortgage debt on default is made optional with the mortgagee, some affirmative action must be taken by him evidencing his election to take advantage of the accelerating provision, and that

until such action has been taken the provision has no operation. *The exercise of the option should be made in a manner clear and unequivocal, so as to leave no doubt as to the mortgagee's intention. The option is effectively exercised by manifesting the fact in such manner as to apprise the mortgagor.* . . . Even a declaration may be a sufficient exercise of the option, but to be effective the declaration must be followed by an affirmative act toward enforcing the declared intention." (Citation omitted; emphasis added; internal quotation marks omitted.) Id.

The Appellate Court's decision in *Northeast Savings, F.A.* v. *Scherban*, supra, 47 Conn. App. 225, is particularly instructive in resolving the defendant's claim. In *Northeast Savings, F.A.*, a mortgage foreclosure case, the borrower contended that the lender had failed to provide sufficient notice of the acceleration of the debt. Id., 227. The lender in *Northeast Savings, F.A.*, had sent the borrowers a default and cure letter on June 1, giving them thirty days to cure the deficiency and warning them that failure to cure *might* result in acceleration of the debt. Id. The June 1 default and cure letter was followed by a letter on July 2, informing the borrowers that they were still in default, and had thirty days to pay the amount in default. Id. On July 22, the lender sent yet another default and cure letter to the borrowers. This letter warned that unless the borrowers paid the full past due amount by August 2, foreclosure proceedings would commence. Id. The debt remained unpaid and the lender subsequently brought the foreclosure action on September 27. Id.

The borrowers in *Northeast Savings, F.A.*, contended that these letters did not satisfy the notice of acceleration provision under the mortgage and note, which provided that "the lender shall give notice to borrower prior to acceleration . . . which shall specify the default, the action required to cure the default, a date not less than

thirty days within which to cure the default and that failure to cure the default may result in acceleration." (Internal quotation marks omitted.) Id., 227–28. The Appellate Court rejected this claim, and concluded that the condition precedent of notice of acceleration had been satisfied because the *first* letter stated that acceleration might result from the borrower's continued failure to cure the default. Id., 228. The court also concluded that the note did not require that the acceleration notice be separate from the notice of default. Id. The court further concluded that "the notice of default satisfied the notice requirement contained in the note because it notified the defendants of the default and the possibility of acceleration." Id.

This court's decision in *Christensen* v. *Cutaia*, supra, 211 Conn. 613, is also instructive. That case involved a series of twelve identical promissory notes in the aggregated principal amount of $70,788, with each note payable to the lender in the amount of $5899 plus interest. Id., 614–15. In *Christensen*, the borrower's payments were, from the outset, untimely. Id., 616. The notes contained an acceleration clause providing for acceleration of the entire aggregated principal amount in the event of default on any one note. Id., 615. The notes also provided no grace period, and contained nonwaiver clauses providing that "the [lender's] failure to assert a right would not amount to a waiver and requiring any waiver to be in writing." Id., 616. After the lender received a late payment on the fourth promissory note, he informed the borrower, both directly and through an employee, that he no longer would tolerate late payments. Id.

Subsequently, the borrower failed to pay his loan on the fifth note on time. Id. The lender contacted the borrower and informed the borrower's secretary that he intended to exercise his rights to declare a default, and accelerate payment on all of the notes; the lender

also sent the borrower notice of this intention via certified mail on that same day. Id. When the borrower received the certified letter, he sent the lender a check as payment for the fifth note, and the lender deposited this check. Id. Shortly thereafter, the lender brought an action for payment of the remaining unpaid balance on the remaining eight promissory notes, due in full, pursuant to the lender's right to accelerate. Id., 616–17. The trial court had determined that there was no genuine issue of material fact and granted the lender's summary judgment motion. Id., 617. The court awarded the entire remaining principal amount plus interest, concluding that "upon the [borrower's] default, the [lender] had properly exercised his right to acceleration and that neither the [borrower's] subsequent tender nor the [lender's] acceptance of payment for [the fifth note] had cured the default." Id.

On appeal, the borrower contended that there was a genuine issue of material fact about whether the lender's acceptance and cashing of earlier late payments amounted to a waiver of the right to accelerate. Id., 619. This court concluded that, "[w]hile inconsistent conduct may, under certain circumstances, be deemed a waiver of a right to acceleration, the insertion of a nonwaiver clause is designed to avoid exactly such an inference." Id., 619–20. Accordingly, the court concluded that the lender had not waived his right to accelerate by his seemingly inconsistent conduct. Id., 620.

We conclude that, under the holdings in *Christensen* v. *Cutaia*, supra, 211 Conn. 619–20, and *Northeast Savings, F.A.* v. *Scherban*, supra, 47 Conn. App. 227–28, the plaintiff clearly and unequivocally exercised its option of accelerating the loan once the defendant had defaulted. The first letter provided ample warning to the defendant that, if she did not cure her default by October 13, the entire loan amount would be accelerated. After the defendant failed to cure her default, the

plaintiff sent prompt notice to the defendant that it considered the debt accelerated, and that the matter had been referred to its attorney for collection. The very next communication to the defendant came five days later from the plaintiff's attorney. Thus, in our view, the defendant had ample awareness of the plaintiff's intentions with respect to acceleration of the debt.[10] Moreover, under this court's interpretation of nonwaiver clauses set forth in *Christensen* v. *Cutaia,* supra, 620, the plaintiff's conduct in affording the defendant eight additional days to stave off the consequences of acceleration and foreclosure by curing the default cannot be construed as a waiver of its option to accelerate the mortgage loan. Indeed, a conclusion by this court that a lender, by giving a borrower one more opportunity to cure a default, has not clearly and unequivocally exercised its right to accelerate the debt, ultimately would militate against persons in the defendant's position; such a conclusion surely would eviscerate any inclination or incentive that a lender might have to extend any kind of generosity or flexibility to borrowers in default, on the eve of commencing litigation.

Moreover, the letter from the plaintiff's attorney was not contradictory, as the defendant claims, because

---

[10] The defendant points out that, at her deposition, Lisa Siedlarz, the plaintiff's assistant vice president in charge of the residential legal department, testified that the October 19 letter from the plaintiff's attorney possibly could mean that the loan had not yet been accelerated. The defendant contends that this testimony is the "only evidence" in the record with respect to the October 19 letter from the plaintiff's attorney, and offers it in support of her claim that the trial court improperly concluded that nothing in the October 19 letter created a genuine issue of material fact. Inasmuch as construction of the mortgage, note and letters presents a question of law, we, however, conclude that Siedlarz's testimony is merely a speculative, and indeed, inadmissible legal opinion; see, e.g., *Sagamore Group, Inc.* v. *Commissioner of Transportation,* 29 Conn. App. 292, 299, 614 A.2d 1255 (1992) ("a witness is incompetent to offer a legal opinion except on the issue of foreign law"); and not, as the defendant contends, evidence that creates an issue of material fact.

beyond affording the defendant a few more days to cure her default, *it did not retract expressly the previous notice of acceleration.* Accordingly, the trial court properly concluded that the plaintiff's letters constituted a clear and unequivocal exercise of its option to accelerate the mortgage debt.[11]

II

## THE DEFENDANT'S FEDERAL FAIR HOUSING CLAIMS UNDER THE FHAA, 42 U.S.C. § 3601 ET SEQ.

The defendant's next claim is that the trial court improperly concluded that the FHAA, 42 U.S.C. § 3601 et seq., does not require a lender foreclosing on a mortgage loan to provide reasonable accommodations for the disabilities of a borrower. Specifically, the defendant contends that 42 U.S.C. § 3604 (f) (1) and (2)[12] are applicable to a lender's attempt to foreclose upon the mortgage of a disabled borrower because the enforce-

---

[11] The defendant contends that the conclusions of *Christensen* v. *Cutaia,* supra, 211 Conn. 619–20, and *Northeast Savings, F.A.* v. *Scherban,* supra, 47 Conn. App. 227–28, do not apply to the present case. The defendant claims that the issues of adequacy of notice and potential waiver, which were addressed in those cases, do not apply in the present case, wherein the issue is whether the plaintiff clearly and unequivocally exercised its option to accelerate. We disagree with the defendant because we deem these issues to be closely related. The degree and nature of the notice afforded the borrower, as well as any possibility of waiver by the lender, undoubtedly inform our assessment of whether the lender clearly and unequivocally exercised its option to accelerate. See *City Savings Bank of Bridgeport* v. *Dessoff,* supra, 3 Conn. App. 649.

[12] Title 42 of the United States Code, § 3604, provides in relevant part: "[I]t shall be unlawful—

"(f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

"(A) that buyer or renter,

"(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

"(C) any person associated with that buyer or renter.

"(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—

ment of mortgage loan agreements "make[s] unavailable or den[ies]" a dwelling, and is a "[service] . . . in connection with such [a] dwelling . . . ." The defendant further claims that, because § 3604 (f) (1) and (2) apply to the enforcement of mortgage loan agreements, the trial court improperly precluded her from receiving a hearing about whether the plaintiff could have provided her with "reasonable accommodations" for her disability pursuant to § 3604 (f) (3) (B).[13]

In response, the plaintiff, relying principally on *Salute* v. *Stratford Greens Garden Apartments*, 136 F.3d 293, 301–302 (2d Cir. 1998), contends that the FHAA does not afford the defendant relief because it only requires accommodations that directly ameliorate the effects of an individual's disability, rather than her economic status. The plaintiff further claims that applying the FHAA to the defendant in this context would constitute an impermissible economic preference for disabled individuals, which ultimately would fundamentally alter loan programs and have deleterious consequences for all lending institutions. We conclude that the trial court correctly determined that 42 U.S.C. § 3604 does not apply to the enforcement of a mortgage, and therefore, properly refused to conduct a hearing about whether the plaintiff should have afforded the defendant a reasonable accommodation for her disability.[14]

---

"(A) that person; or

"(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

"(C) any person associated with that person. . . ."

[13] Title 42 of the United States Code, § 3604 (f) (3), provides in relevant part: "For purposes of this subsection, discrimination includes . . . (B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling . . . ."

[14] We note that the plaintiff seemingly concedes the defendant's claim that the FHAA applies to the enforcement of mortgage loan agreements because foreclosure constitutes either the "otherwise mak[ing] unavailable or deny[ing]" of a dwelling, or the "provision of services . . . in connection with such [a] dwelling . . . ." 42 U.S.C. § 3604 (f) (1) and (2). Indeed, the

We begin our analysis of the defendant's claim by setting forth the appropriate standard of review and the process by which we interpret federal statutes. "Statutory construction is a question of law and therefore our review is plenary." (Internal quotation marks omitted.) *In re Joshua S.*, 260 Conn. 182, 213, 796 A.2d 1141 (2002). We ordinarily interpret Connecticut statutes in accordance with the purposive formulation set forth in *State* v. *Courchesne*, 262 Conn. 537, 577–78, 816 A.2d 562 (2003). In the present case, however, we are required to interpret *federal* statutes, namely, provisions of the FHAA and the ADA. Thus, despite our express rejection of the plain meaning rule in *Courchesne*, principles of comity[15]

plaintiff does not offer extensive arguments in support of the trial court's conclusion with respect to whether 42 U.S.C. § 3604, General Statutes § 46a-64b et seq., or the ADA apply to mortgage foreclosures. Instead, the plaintiff devotes the vast majority of its brief to the question of whether reasonable accommodations or modifications are possible under the FHAA and ADA, namely, whether any accommodations directly would ameliorate the defendant's disability, rather than her poverty. The defendant then responds to the plaintiff's contentions on this point in her reply brief.

It is well established that "[w]here the trial court reaches a correct decision but on [alternate] grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it. . . . [W]e . . . may affirm the court's judgment on a dispositive alternate ground for which there is support in the trial court record." (Citation omitted; internal quotation marks omitted.) *Hoskins* v. *Titan Value Equities Group, Inc.*, 252 Conn. 789, 794, 749 A.2d 1144 (2000). Nevertheless, our analysis herein is confined to the threshold question before both this court and the trial court, namely, the applicability of 42 U.S.C. § 3604 to mortgage foreclosures.

[15] We note that the United States Court of Appeals for the Second Circuit has recognized the potential effect of our ruling in *State* v. *Courchesne*, supra, 262 Conn. 577–78, on questions of statutory construction, and it has acted accordingly. In *Sealed* v. *Sealed*, 332 F.3d 51, 59–60 (2d Cir. 2003), the Second Circuit certified to us two questions of law involving the construction of General Statutes § 17a-101g (c). The Second Circuit concluded that, although it "may ordinarily interpret ambiguous state statutes using the normal rules of statutory interpretation, even in the absence of controlling state authority," certification of these questions to us was appropriate because, inter alia, of the broader interpretive approach of *Courchesne*. Id., 59. It noted that we "may well exercise 'more flexibility and broader interpretive power' than the federal courts in analyzing the meaning of § 17a-

and consistency[16] dictate that we follow it in the present case, because that is the rule of construction utilized by the United States Court of Appeals for the Second Circuit. See, e.g., *United States* v. *Ripa*, 323 F.3d 73, 81 (2d Cir. 2003).

Accordingly, our analysis of the federal statutes in the present case "begins with the plain meaning of the statute. . . . If the text of a statute is ambiguous, then we must construct an interpretation consistent with the primary purpose of the statute as a whole." (Citation omitted.) Id.; see also *In re Caldor Corp.*, 303 F.3d 161, 167–68 (2d Cir. 2002) ("[a]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute" [internal quotation marks omitted]). Under the plain meaning rule, "[l]egislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous." (Internal quotation marks

101g (c)." Id.; see also *Chrzanoski* v. *Ashcroft*, 327 F.3d 188, 191, 196 and n.13 (2d Cir. 2003) ("reject[ing] the government's invitation to ignore the plain meaning of 'force,' " and stating that *Courchesne* approach does not control analysis of 18 U.S.C. § 16 (a), which defines " 'crime of violence' " for deportation purposes as one involving " 'physical force,' " "even though the underlying offense is one of Connecticut state law"). Indeed, in certifying a question of statutory construction to the New York Court of Appeals, the Second Circuit also has noted that broader state approaches to statutory construction might well yield a different result than "well-established federal rules of statutory construction . . . ." *Allstate Ins. Co.* v. *Serio*, 261 F.3d 143, 152 (2d Cir. 2001).

These opinions demonstrate that the Second Circuit has acknowledged and deferred to the states' various approaches to statutory construction, especially with respect to their own statutes. Principles of intergovernmental comity demand that we afford that court similar respect. Accordingly, we will apply the plain meaning rule to the questions of federal statutory construction that we are required to answer in the present case.

[16] The decisions of the Second Circuit Court of Appeals carry particularly persuasive weight in the interpretation of federal statutes by Connecticut state courts. *Thomas* v. *West Haven*, 249 Conn. 385, 392, 734 A.2d 535 (1999), cert. denied, 528 U.S. 1187, 120 S. Ct. 1239, 146 L. Ed. 2d 99 (2000). Thus, that court's decisions may be more helpful to us if we follow the same analytical approach to federal statutory interpretation that it does.

omitted.) *In re Venture Mortgage Fund, L.P.*, 282 F.3d 185, 188 (2d Cir. 2002). Thus, our interpretive process will begin by "inquiring whether the plain language of [each] statute, when given 'its ordinary, common meaning' . . . is ambiguous." (Citation omitted.) *In re Caldor Corp.*, supra, 168.

Thus, our interpretive task begins with the relevant statutory language. The FHAA is a comprehensive array of statutes aimed at preventing discrimination in various housing and real estate related contexts.[17] Section 3604 of the FHAA provides that "it shall be unlawful . . . (f) (1) [t]o discriminate in the sale or rental, or to *otherwise make unavailable or deny*, a dwelling to any buyer or renter *because of a handicap* of . . . (A) that buyer or renter . . . ." (Emphasis added.) Section 3604 (f) (2) of the FHAA then provides that it shall be unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the *provision of services* or facilities in connection with such dwelling, *because of a handicap* of . . . (A) that person . . . ." (Emphasis added.) Finally, § 3604 (f) (3) of the FHAA provides that "[f]or purposes of this subsection, discrimination includes . . . (B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such [handicapped] person equal opportunity to use and enjoy a dwelling . . . ." Thus, the defendant contends that, because the enforcement of mortgage loan agreements is a "[service]" or alternatively "make[s] unavailable or den[ies]" a dwelling pursuant to § 3604 (f) (1) and (2), the plaintiff was required under § 3604 (f) (3) to afford the defendant

---

[17] The parties do not dispute that the defendant has a "handicap" within the meaning of the FHAA. See 42 U.S.C. § 3602 (h) (" '[h]andicap' means . . . [1] a physical or mental impairment which substantially limits one or more of such person's major life activities, [2] a record of having such an impairment, or [3] being regarded as having such an impairment").

reasonable accommodations as to the plaintiff's rules, policies, practices, or services in light of her disability.

The defendant's arguments with respect to § 3604 (f) (1) and (2) are, at first blush, linguistically appealing, especially given the ambiguity of the operative statutory terms, namely, "services," or "make unavailable or deny." We conclude, however, that § 3604 of the FHAA, and its reasonable accommodations provision, afford the defendant no relief. Indeed, discrimination in mortgage foreclosures is addressed solely by a different section of the FHAA, namely, 42 U.S.C. § 3605.[18] Put differently, the defendant's proposed application of § 3604 is precluded by the existence of § 3605.

Section 3605 of the FHAA is entitled "[d]iscrimination in residential real estate-related transactions." Section 3605 provides in relevant part that "[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of . . . handicap . . . ." Section 3605 (b) defines " 'residential real estate-related transaction' " as "(1) [t]he making or purchasing of loans or providing other financial assistance—(A) for

---

[18] Title 42 of the United States Code, § 3605, provides in relevant part: "(a) . . . It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin. . . .

"(b) . . . As used in this section, the term 'residential real estate-related transaction' means any of the following:

"(1) The making or purchasing of loans or providing other financial assistance—

"(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or

"(B) secured by residential real estate. . . ."

purchasing, constructing, improving, repairing, or maintaining a dwelling; or (B) secured by residential real estate. . . ." Moreover, § 3605, unlike § 3604, does not include any provision stating that the failure to provide reasonable accommodations constitutes discrimination.

Having reviewed the various statutory sections that comprise the FHAA, we conclude that the defendant's claims of discrimination in the enforcement of mortgage loan agreements unambiguously fall within the ambit of 42 U.S.C. § 3605. See, e.g., *Gaona* v. *Town & Country Credit*, 324 F.3d 1050, 1056 n.7 (8th Cir. 2003) (noting that 42 U.S.C. § 3604 "bars discrimination in sales and rentals, rather than loans"); *Harper* v. *Union Savings Assn.*, 429 F. Sup. 1254, 1257–58, 1271 (N.D. Ohio 1977) (although court concluded posttrial that borrowers failed to prove racial discrimination, court stated that "it is the intent of Congress that [42 U.S.C. §] 3605's prohibitions against discrimination on the part of lending institutions in connection with real estate loans proscribe discrimination in the manner in which a lending institution forecloses a delinquent or defaulted mortgage note since the right of foreclosure is one of the 'terms or conditions of such loan' ").[19] Indeed, we conclude further that the specific applicability of § 3605 to the context of enforcement of mortgage loan agreements precludes the application of § 3604 in that same arena. See, e.g., *Eva* v. *Midwest National Mort-*

[19] See also *Sundae* v. *Midwest Savings & Loan Assn.*, United States District Court, Docket No. 3-79-215 (D. Minn. October 13, 1981) (although court granted lender's motion for summary judgment because borrower failed to introduce evidence of discrimination, court held that "action for alleged discrimination in the prosecution of a foreclosure action is . . . authorized by [42 U.S.C.] § 3605"); *Lindsey* v. *Modern American Mortgage Corp.*, 383 F. Sup. 293, 294 (N.D. Tex. 1974) (court determined that African-American borrower alleging that mortgage company would not have foreclosed on his delinquent loan had he been "white person who was trying to make up a delinquent account" had stated claim under 42 U.S.C. § 3605).

*gage Banc, Inc.*, 143 F. Sup. 2d 862, 886 (N.D. Ohio 2001) ("§ 3604 relates to *acquiring* a home, while § 3605 applies to the making or purchasing of loans or providing other financial assistance for maintaining a *dwelling previously acquired*" [emphasis added]).[20] Thus,

[20] We are mindful of the apparent split in authority that has arisen in the context of insurance redlining, a practice not addressed specifically in any section of the FHAA itself, about whether the existence of 42 U.S.C. § 3605 necessarily circumscribes the scope of 42 U.S.C. § 3604. In *Mackey* v. *Nationwide Ins. Co.*, 724 F.2d 419, 423 (4th Cir. 1984), the United States Court of Appeals for the Fourth Circuit concluded, inter alia, that the reach of § 3604 is circumscribed by the existence of § 3605. In *Mackey*, the Fourth Circuit stated that "[i]f [§ 3604] was designed to reach every discriminatory act that might conceivably affect the availability of housing, [§ 3605]'s specific prohibition of discrimination in the provision of financing would have been superfluous." Id.

Thereafter, in *NAACP* v. *American Family Mutual Ins. Co.*, 978 F.2d 287, 297–301 (7th Cir. 1992), cert. denied, 508 U.S. 907, 113 S. Ct. 2335, 124 L. Ed. 2d 247 (1993), the United States Court of Appeals for the Seventh Circuit declined to follow the Fourth Circuit's decision in *Mackey* v. *Nationwide Ins. Co.*, supra, 724 F.2d 423. The Seventh Circuit disagreed with Fourth Circuit's "unstated assumption" that statutes are not to be interpreted in such a way so as to overlap. *NAACP* v. *American Family Mutual Ins. Co.*, supra, 298. The court stated that "[a] wise drafter may state a principle in one section and list some applications of that principle in another, to make pellucid what ought to be apparent but which some judges (and many lay persons) will miss unless spelled out. Using the instance to restrict the principle would gum up the process of communication, inverting every effort to clarify." Id.; see also *Nationwide Mutual Ins. Co.* v. *Cisneros*, 52 F.3d 1351, 1357 (6th Cir. 1995) ("[w]e agree with the conclusion in *American Family [Mutual Ins. Co.]* that §§ 3604 and 3605 overlap and are not mutually exclusive"), cert. denied, 516 U.S. 1140, 116 S. Ct. 973, 133 L. Ed. 2d 893 (1996); *National Fair Housing Alliance, Inc.* v. *Prudential Ins. Co. of America*, 208 F. Sup. 2d 46, 56–58 (D.D.C. 2002) (citing split in authority and concluding that claims of homeowners' insurance redlining practices are actionable under either §§ 3604 or 3605).

Our research reveals that the courts of the Second Circuit have not yet addressed the issue of whether 42 U.S.C. §§ 3604 and 3605 have overlapping coverage. Thus, we are persuaded by the District Court's decision in *Eva* v. *Midwest National Mortgage Banc, Inc.*, supra, 143 F. Sup. 2d 886, wherein the court concluded that "§ 3604 relates to acquiring a home, while § 3605 applies to the making or purchasing of loans or providing other financial assistance for maintaining a *dwelling previously acquired.*" (Emphasis added.) See also *Thomas* v. *First Federal Savings Bank of Indiana*, 653 F. Sup. 1330, 1337 (N.D. Ind. 1987) (dismissing claim of redlining in second

although the text of § 3605 unmistakably evinces the intent of Congress to prohibit discrimination in the context of mortgage lending and enforcement, that same

mortgage loan brought pursuant to § 3604). In *Eva*, the Ohio District Court acknowledged that it was bound by the Sixth Circuit's endorsement of the Seventh Circuit's approach to the split of authority, namely, that §§ 3604 and 3605 overlap and "are not mutually exclusive." *Eva* v. *Midwest National Mortgage Banc, Inc.*, supra, 884, citing *Nationwide Mutual Ins. Co.* v. *Cisneros*, supra, 52 F.3d 1357. Nevertheless, recognizing the temporal distinction between §§ 3604 and 3605, the court dismissed claims, brought pursuant to § 3604, of redlining and reverse redlining in home refinancing loans that were alleged to be predatory. *Eva* v. *Midwest National Mortgage Banc, Inc.*, supra, 886. The Ohio District Court concluded that § 3604 was inapplicable because the plaintiffs in that case were refinancing previously acquired property. Id., 884. Accordingly, we follow the Ohio decision, and we conclude that § 3604 is inapplicable in the present case, wherein financing is at issue, but the defendant already has acquired the dwelling at issue.

Nevertheless, even if we were to conclude that 42 U.S.C. § 3604 applies in the present situation, the statute's reasonable accommodations provision is no defense for the defendant in this action. In *Salute* v. *Stratford Greens Garden Apartments*, supra, 136 F.3d 301, the Second Circuit stated that "[w]e think it is fundamental that the law addresses the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps." The court rejected the plaintiffs' attempt "to use [the reasonable accommodations] statute to remedy economic discrimination of a kind that is practiced without regard to handicap . . . [noting that the] 'opportunity to use and enjoy' language of the FHAA reinforces the ability of people with handicaps to have the same opportunity as similarly situated persons who have no evident handicaps. What stands between these plaintiffs and the [defendant's] apartments . . . is a shortage of money, and nothing else. *In this respect, impecunious people with disabilities stand on the same footing as everyone else.* Thus, the accommodation sought by [the] plaintiffs is not 'necessary' to afford handicapped persons 'equal opportunity' to use and enjoy a dwelling." (Emphasis added.) Id., 302. Finally, the Second Circuit concluded by stating that "Congress could not have intended the FHAA to require reasonable accommodations for those with handicaps every time a neutral policy imposes an adverse impact on individuals who are poor. *The FHAA does not elevate the rights of the handicapped poor over the rights of the non-handicapped poor. Economic discrimination—such as the refusal to accept Section 8 tenants—is not cognizable as a failure to make reasonable accommodations,* in violation of § 3604 (f) (3) (b)." (Emphasis added.) Id. Accordingly, we conclude that any accommodation, no matter how reasonable, that the plaintiff possibly could make in the present case would be economic, and not addressed directly toward the amelioration of the defendant's disability, and therefore, not cognizable under § 3604 (f) (3) (b).

section also provides us with the sole avenue for the consideration of such discrimination claims.[21]

Moreover, the regulations issued by the Secretary of Housing and Urban Development (secretary) to effectuate the FHAA further demonstrate that the enforcement of mortgage loan agreements is governed solely by 42 U.S.C. § 3605. "[I]t is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement." (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Dept. of Environmental Protection*, 257 Conn. 128, 138, 778 A.2d 7 (2001). Moreover, it is well established that "unless [administrative regulations] are shown to be inconsistent with the authorizing statute, they have the force and effect of a statute." (Internal quotation marks omitted.) *Mass* v. *United States Fidelity & Guaranty Co.*, 222 Conn. 631, 649, 610 A.2d 1185 (1992). The organizational scheme of the regulations promulgated pursuant to the FHAA indicates that the secretary did not contemplate mortgage related matters arising under 42 U.S.C. § 3604. Part 100 of title 24 of the Code of Federal Regulations provides the regulations that address discriminatory conduct under the FHAA; it is further divided into subparts. Subpart B of title 24 of the Code of Federal Regulations, §§ 100.50 through 100.90, "provides the [secretary's] interpretation of conduct that is unlawful housing discrimination under" 42 U.S.C. § 3604, as well as 42 U.S.C. § 3606,[22]

---

[21] We note that the amici agree generally with the defendant that the FHAA does apply to the enforcement of mortgage agreements, but disagree about which particular provision of the FHAA is implicated in the mortgage context. Unlike the defendant, who claims that 42 U.S.C. § 3604 governs, the amici claim that 42 U.S.C. § 3605 applies. We agree with the amici that mortgage agreements are governed by § 3605 of the FHAA. We also note, however, that the amici do not claim that § 3605 obligates a lender to provide a disabled borrower with reasonable accommodations for his or her disability.

[22] Title 42 of the United States Code, § 3606, provides: "After December 31, 1968, it shall be unlawful to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organiza-

which proscribes discrimination in the provision of brokerage services. 24 C.F.R. § 100.50 (a).[23] Subpart B addresses the following areas of discrimination: (1) "[u]nlawful refusal to sell or rent or to negotiate for the sale or rental"; 24 C.F.R. § 100.60; (2) "[d]iscrimination in terms, conditions and privileges and in services and facilities"; 24 C.F.R. § 100.65; (3) "[o]ther prohibited sale and rental conduct"; 24 C.F.R. § 100.70; (4) "[d]iscriminatory advertisements, statements and notices"; 24 C.F.R. § 100.75; (5) "[d]iscriminatory representations on the availability of dwellings"; 24 C.F.R. § 100.80; (6) "[b]lockbusting"; 24 C.F.R. § 100.85; and (7) "[d]iscrimination in the provision of brokerage services." 24 C.F.R. § 100.90. We note that loans and their enforcement are not mentioned anywhere within the comprehensive array of detailed regulations that comprise subpart B. Indeed, we also note that mortgage loans and their enforcement are not mentioned in subpart D of title 24 of the Code of Federal Regulations §§ 100.200 through 100.205, which effectuates 42 U.S.C. § 3604 (f) (3), the reasonable accommodations provision under the FHAA.

In contrast to subparts B and D, subpart C of title 24 of the Code of Federal Regulations, §§ 100.110 through 100.148, contains ample references to loans and mortgages, and "provides the [secretary's] interpretation of

tion or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, handicap, familial status, or national origin."

[23] Title 24 of the Code of Federal Regulations, § 100.50 (a), provides: "This subpart provides the [secretary's] interpretation of conduct that is unlawful housing discrimination under section 804 and section 806 of the Fair Housing Act. In general the prohibited actions are set forth under sections of this subpart which are most applicable to the discriminatory conduct described. However, an action illustrated in one section can constitute a violation under sections in the subpart. For example, the conduct described in § 100.60(b)(3) and (4) would constitute a violation of § 100.65(a) as well as § 100.60(a)."

the conduct that is unlawful housing discrimination under" 42 U.S.C. § 3605. 24 C.F.R. § 100.110 (a).[24] Subpart C contains a multitude of detailed regulations addressing discrimination in loan enforcement, which proscribe: (1) "[d]iscriminatory practices in residential real estate-related transactions"; 24 C.F.R. § 100.110; (2) "[r]esidential real estate-related transactions"; 24 C.F.R. § 100.115; (3) "[d]iscrimination in the making of loans and in the provision of other financial assistance"; 24 C.F.R. § 100.120; (4) "[d]iscrimination in the purchasing of loans"; 24 C.F.R. § 100.125; and (5) "[d]iscrimination in the terms and conditions for making available loans or other financial assistance." 24 C.F.R. § 100.130. Thus, this interpretive treatment by the secretary charged with the enforcement of the FHAA, in accordance with the statutory text and the otherwise silent legislative history, confirms that 42 U.S.C. § 3605 is the sole FHAA provision applicable to mortgage servicing and enforcement. We, therefore, disagree with the defendant's claim that mortgage servicing and enforcement "otherwise make[s] unavailable or den[ies]" a dwelling or is a "[service]" in connection with a dwelling for purposes of 42 U.S.C. § 3604 (f) (1) and (2).

Having held that relief for claims of discrimination in the enforcement of mortgage loan agreements lies solely under 42 U.S.C. § 3605, we now turn to the defendant's claim that she was entitled to reasonable accommodations for her disability. As previously discussed, the predicate for the defendant's claim for accommodation is that, pursuant to 42 U.S.C. § 3604 (f) (3), failure to provide reasonable accommodations for individuals with disabilities constitutes impermissible discrimination. As noted previously, however, unlike § 3604, § 3605 does not contain a similar reasonable accommo-

[24] Title 24 of the Code of Federal Regulations, § 100.110 (a), provides: "This subpart provides the [secretary's] interpretation of the conduct that is unlawful housing discrimination under section 805 of the Fair Housing Act."

dations provision. Thus, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (Internal quotation marks omitted.) *Russello* v. *United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983); accord *Vaillancourt* v. *New Britain Machine/Litton*, 224 Conn. 382, 396, 618 A.2d 1340 (1993) ("[w]e are not permitted to supply statutory language that the legislature may have chosen to omit"). We, therefore, presume that Congress' exclusion of "reasonable accommodations" language in 42 U.S.C. § 3605 evinces clear legislative intent not to include the failure to provide reasonable accommodations as a form of impermissible discrimination under that statute.

Indeed, we find particularly persuasive the recent decision of the Eighth Circuit Court of Appeals in *Gaona* v. *Town & Country Credit*, supra, 324 F.3d 1050. In *Gaona*, the plaintiff mortgagors, a deaf married couple, had defaulted on their mortgage loan and the defendant bank sought to foreclose. Id., 1052. The plaintiffs brought an action and claimed that the defendant, inter alia, had violated 42 U.S.C. § 3605 by failing to provide them with a sign language interpreter during loan negotiations. Id., 1052–53. In support of their claim, the plaintiffs cited 24 C.F.R. § 100.204,[25] and claimed that the regulation was evidence of a general reasonable accommodations requirement under the FHAA. Id., 1056 n.7. The Eighth Circuit concluded that the regulation "does not apply to 42 U.S.C. § 3605, but rather to 42 U.S.C. § 3604 (f) (2) . . . which bars discrimination in sales

[25] Title 24 of the Code of Federal Regulations, § 100.204 (a), provides: "It shall be unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas."

and rentals, rather than loans . . . ." Id. The court concluded that the trial court properly granted the defendant summary judgment because the lender "did not refuse to transact business with the [plaintiffs]. [They] received all required disclosures and notices, and there was no evidence that they were given inaccurate or differing information from that provided to other borrowers. Because 42 U.S.C. § 3605 does not define discrimination to include a lender's refusal to make reasonable accommodations, [the lender] was under no obligation under [§] 3605 of the FHAA to provide a sign language interpreter . . . ." Id., 1057.

We adopt the well reasoned decision in *Gaona*, and we conclude that the trial court properly refused to provide the defendant with a hearing about possible reasonable accommodations, because such accommodations are not required under 42 U.S.C. § 3605.[26] Thus, lenders such as the plaintiff in the present case need not alter their generally applicable terms or conditions in order to accommodate an individual's disability. In this case, the defendant has not claimed that her mortgage loan was subject to different terms and conditions than that of other individuals engaging in mortgage transactions with the plaintiff. Thus, the trial court correctly precluded a hearing about whether, in enforcing the mortgage, the plaintiff could afford the defendant reasonable accommodations for her disability.

## III

### THE DEFENDANT'S STATE FAIR HOUSING CLAIMS UNDER § 46a-64b ET SEQ.

The defendant next claims that the trial court improperly concluded that the state fair housing laws, § 46a-

---

[26] The defendant offers two examples of possible reasonable accommodations: (1) temporary postponement of the initiation of foreclosure proceedings; or (2) modification in her payment schedule, which would allow her temporarily to make principal only payments on her mortgage. Having concluded that 42 U.S.C. § 3605 does not require lenders to make reasonable

64b et seq., did not require the plaintiff to provide the defendant with reasonable accommodations for her disability in the servicing and enforcement of her mortgage loan. In response, the plaintiff claims that the state fair housing laws do not require lenders to make reasonable accommodations in the provision of lending services. We conclude that § 46a-64b et seq. do not require a lender to make reasonable accommodations for a borrower's disability in the mortgage servicing and enforcement context.

We note at the outset that the relevant language of the state fair housing statute, General Statutes § 46a-64c (a) (6) and (7),[27] is virtually identical to the language and structure of 42 U.S.C. §§ 3604 (f) and 3605, which were discussed in part II of this opinion.[28] Similar to

accommodations to assist disabled persons in such transactions, we need not analyze the propriety of these and other possible accommodations.

[27] General Statutes § 46a-64c provides in relevant part: "(a) It shall be a discriminatory practice in violation of this section . . .

"(6) (A) To discriminate in the sale or rental, or *to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a learning disability or physical or mental disability* of: (i) Such buyer or renter . . . .

"(B) To discriminate against any person in the *terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling*, because of a learning disability or physical or mental disability of: (i) Such person . . . .

"(C) For purposes of this subdivision, discrimination includes . . . (ii) *a refusal to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling* . . . .

"(7) For any person or other entity engaging in residential real-estate-related transactions to discriminate against any person in *making available such a transaction, or in the terms or conditions of such a transaction*, because of race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income, familial status, learning disability or physical or mental disability. . . ." (Emphasis added.)

[28] We also note that it is undisputed that the defendant is disabled under the definition provided in § 46a-64b (8), which provides that " '[p]hysical or mental disability' includes, but is not limited to, mental retardation, as defined in section 1-1g, and physical disability, as defined in subdivision (15) of section 46a-51 and also includes, but is not limited to, persons who have a handicap as that term is defined in the Fair Housing Act."

42 U.S.C. § 3604, the state statute also makes it unlawful to "discriminate in the sale or rental, or *to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a learning disability or physical or mental disability* of: (i) [s]uch buyer or renter . . . ." (Emphasis added.) General Statutes § 46a-64c (a) (6) (A). Moreover, the state fair housing statute prohibits discrimination "against any person in the *terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling,* because of a learning disability or physical or mental disability of: (i) [s]uch person . . . ." (Emphasis added.) General Statutes § 46a-64c (a) (6) (B). The state fair housing statute provides further that "discrimination includes . . . (ii) *a refusal to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling* . . . ." (Emphasis added.) General Statutes § 46a-64c (a) (6) (C).

Structurally, the state fair housing statute also tracks the federal scheme by providing in § 46a-64c (a) (7) that a "person or other entity engaging in residential real-estate-related transactions" is barred from discriminating against any person on the basis of "race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income, familial status, learning disability or physical or mental disability" in the making available of such transactions or in the terms or conditions of such transactions. We note that the language is, in all relevant aspects, identical to the text of 42 U.S.C. § 3605. Moreover, just like within the federal scheme, § 46a-64c (a) (7) does not, as § 46a-64c (a) (6) does, define "discrimination" under the statute as a failure to provide reasonable accommodations for disabled individuals in residential real estate-related transactions.

It is well established that "in addressing claims brought under both federal and state housing laws, we are guided by the cases interpreting federal fair housing laws . . . despite differences between the state and federal statutes." (Citation omitted; internal quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Orange*, 256 Conn. 557, 591, 775 A.2d 284 (2001). Inasmuch as the relevant provisions of the state and federal fair housing statutes in the present case are virtually identical, we apply the analysis that we utilized in evaluating the defendant's FHAA claims.[29] See part II of this opinion. Accordingly, we conclude that, although the state fair housing act, § 46a-64b et seq., applies to the servicing and enforcement of a mortgage, the particular statutory provision that governs discrimination in the context of enforcement of mortgage loan agreements does not require that a lender provide accommodations for a borrower's disability by varying the terms or condi-

---

[29] Affording the state and federal fair housing statutes the same construction is entirely compatible with the purposive approach that we follow in construing state statutes. See *State* v. *Courchesne*, supra, 262 Conn. 577–78. The relevant legislative history reveals that this construction is consistent with the state statutes' purpose. After the FHAA was enacted in 1988, the Connecticut fair housing statutes were amended by Public Acts 1990, No. 90-246, which was entitled "An Act Adopting a Comprehensive Connecticut Fair Housing Statute Conforming to the Federal Fair Housing Act." Senator Richard Blumenthal introduced the bill that was passed as Public Act 90-246 as "landmark legislation . . . that sets out a separate fair housing act with all the standards and assurances that exist under federal law. Indeed, it incorporates the federal standards into our state statute . . . ." 33 S. Proc., Pt. 11, 1990 Sess., p. 3494. Moreover, then Attorney General Clarine Nardi-Riddle testified before the judiciary committee in support of the bill, and stated that "[i]n 1988 Congress passed federal fair housing amendments which mandate that states must have fair housing laws that are substantially equivalent to the federal fair housing laws as specified by the regulations of the Department of Housing and Urban Development. Failure to obtain this equivalency will result in the loss of federal reimbursement funding. This House Bill accomplishes the requirements through technical and substantive amendments to our current laws to make it conform with the federal law." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1990 Sess., pp. 1000–1001.

tions of an otherwise generally applicable mortgage policy.

## IV

## THE DEFENDANT'S CLAIMS UNDER THE ADA, 42 U.S.C. § 12181 ET SEQ.

The defendant's next claim is that the trial court improperly concluded that the ADA's reasonable modifications provisions apply only in the employment context and, therefore, do not require lenders to afford disabled persons any accommodations in the enforcement of mortgage loans. Specifically, the defendant and amici contend that the trial court's conclusion was improper because: (1) Title III of the ADA, and in particular 42 U.S.C. §§ 12181[30] and 12182 (a),[31] applies to the enforcement of a mortgage because loan servicing and enforcement is a "[service]" offered by the plaintiff lender, which is a place of public accommodation under Title III of the ADA; and (2) under 42 U.S.C. § 12182 (b) (2) (A) (ii),[32] the plaintiff was required to make reasonable modifications in its enforcement policies and procedures to accommodate the defendant's dis-

---

[30] Title 42 of the United States Code, § 12181 (7), provides in relevant part: "The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce—(F) . . . bank[s] . . . ."

[31] Title 42 of the United States Code, § 12182 (a), provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

[32] Title 42 of the United States Code, § 12182 (b) (2) (A), provides in relevant part: "For purposes of subsection (a) of this section, discrimination includes . . .

"(ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations . . . ."

ability. The plaintiff contends, in response, that: (1) the ADA regulates only access to, but not the content of, goods and services offered by a place of public accommodation, such as a bank; and (2) modifications in the enforcement of the defendant's mortgage would not be alterations to accommodate her disability directly and, therefore, are not required by the ADA. We conclude that: (1) the requirements of 42 U.S.C. § 12182 are triggered because mortgage loan servicing and enforcement is a "[service]" provided by a "place of public accommodation"; and (2) the plaintiff was not required to afford the defendant reasonable modifications in the content and enforcement of the mortgage because Title III of the ADA regulates access to mortgages, but does not govern the content of mortgages.

We begin with the relevant statutory language. Section 12182 (a) of the ADA provides the general rule that "[n]o individual shall be discriminated against *on the basis of disability* in the full and equal enjoyment of the goods, *services*, facilities, privileges, advantages, or accommodations of any *place of public accommodation* by any person who owns, leases (or leases to), or operates a place of public accommodation." (Emphasis added.) A bank expressly is among the "private entities" that are considered "public accommodations" for purposes of Title III of the ADA. 42 U.S.C. § 12181 (7) (F). Finally, "discrimination includes . . . a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations . . . ." 42 U.S.C. § 12182 (b) (2) (A) (ii). The United States Supreme Court has noted that "the statute contemplates three inquiries: whether

the requested modification is 'reasonable,' whether it is 'necessary' for the disabled individual, and whether it would 'fundamentally alter the nature of' " the policy, practice, or procedure. *PGA Tour, Inc.* v. *Martin*, 532 U.S. 661, 683 n.38, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001). "Whether one question should be decided before the others likely will vary from case to case, for in logic there seems to be no necessary priority among the three." Id.

We next review the legislative purpose of the ADA, as summarized by the Supreme Court in *PGA Tour, Inc.* "Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals. In studying the need for such legislation, Congress found that 'historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.' . . . Congress noted that the many forms such discrimination takes include 'outright intentional exclusion' as well as the 'failure to make modifications to existing facilities and practices.' . . . After thoroughly investigating the problem, Congress concluded that there was a 'compelling need' for a 'clear and comprehensive national mandate' to eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of American life.' . . . In the ADA, Congress provided that broad mandate. . . . In fact, one of the [ADA's] 'most impressive strengths' has been identified as its 'comprehensive character' . . . and accordingly the [ADA] has been described as 'a milestone on the path to a more decent, tolerant, progressive society' . . . . To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the [ADA]), public services (Title

II), and public accommodations (Title III)." (Citations omitted.) Id., 674–75.

Our first point of inquiry is to determine whether the provision and enforcement of a mortgage are "services" that trigger the requirements of 42 U.S.C. § 12182 (a) of the ADA.[33] The Second Circuit Court of Appeals decision in *Pallozzi* v. *Allstate Life Ins. Co.*, 198 F.3d 28 (2d Cir. 1999), as amended on denial of reh., 204 F.3d 392 (2d Cir. 2000), is especially instructive on this issue. In *Pallozzi*, the plaintiffs claimed that an insurance company violated Title III of the ADA by refusing to sell them life insurance because of their mental disabilities. Id., 30. The Second Circuit analyzed the statutory language of Title III and concluded that the ADA regulates insurance underwriting practices. Id., 31. Confining its inquiry to the text of § 12182 (a), the court stated that the sales of insurance policies are the primary "goods and services" offered in an " 'insurance office,' " which is included explicitly in the statute as a " 'place of public accommodation.' " Id., 31, 32–33; see also 42 U.S.C. § 12181 (7) (F).

We similarly conclude that mortgage servicing and enforcement are "services" provided by the plaintiff under 42 U.S.C. § 12182 (a), and that Title III of the ADA, therefore, applies to the provision of such services. Just as the life insurance policy in *Pallozzi* v. *Allstate Life Ins. Co.*, supra, 198 F.3d 30–33, was a good or service offered by an insurance office, a mortgage loan certainly is a service offered by a bank. Indeed, like the Second Circuit, we are persuaded by the defendant's reliance

[33] Although there is a further statutory requirement under 42 U.S.C. § 12182 (a), that the offeror of the good, service, facility, privilege, advantage, or accommodation be a "place of public accommodation," that requirement has been met with regard to banks such as the plaintiff, and does not require any significant analysis. Congress specifically included banks as a private entity to be considered a place of public accommodation for ADA purposes. 42 U.S.C. § 12181 (7) (F).

on the broad language of § 12182 (a), especially in light of the express remedial purpose of the ADA. See, e.g., *PGA Tour, Inc.* v. *Martin,* supra, 532 U.S. 674–76; see also 42 U.S.C. § 12101 (b).[34] Accordingly, we conclude that the trial court's ruling that the ADA's reasonable modifications provisions apply only in the context of employment was improper.

Having determined that the ADA applies within the context of mortgages, we now turn to the question of whether the ADA requires the plaintiff to afford the disabled defendant a reasonable modification in its mortgage servicing and enforcement practices. The defendant and amici contend that she is entitled to a hearing under 42 U.S.C. § 12182 (b) (2) (A) (ii) to determine whether the plaintiff could have made "reasonable modifications" to its foreclosure policies, practices and procedures, without "fundamentally alter[ing]" the nature of its mortgage services. In response, the plaintiff claims that: (1) modification of its foreclosure policies is a revision that alters the content of those services, and therefore is not required under *Doe* v. *Mutual of Omaha Ins. Co.,* 179 F.3d 557, 560 (7th Cir. 1999), cert. denied, 528 U.S. 1106, 120 S. Ct. 845, 145 L. Ed. 2d 714 (2000); and (2) modifications to its default and foreclosure procedure are not required because they would not ameliorate directly the defen-

---

[34] Title 42 of the United States Code, § 12101 (b), provides: "Purpose

"It is the purpose of this chapter—

"(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

"(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

"(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

"(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities."

dant's disability as is required by the ADA, but rather would alleviate the hardships of her economic status. We conclude that the plaintiff is not required to modify its default and foreclosure policies and procedures pursuant to § 12182 (b) (2) (A) (ii), because the ADA operates to afford equal *access* to goods, services, facilities, privileges, advantages and accommodations, but does not regulate the *content* of such goods, services, facilities, privileges and advantages.

Section 12182 (b) (2) (A) (ii) provides that discrimination under the scheme shall include "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary *to afford* such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would *fundamentally alter the nature* of such goods, services, facilities, privileges, advantages, or accommodations . . . ." (Emphasis added.) The statute by its plain language, therefore, constructs a scheme wherein subject entities are required to provide reasonable modifications to afford disabled persons equal *access* to certain activities. Such modifications are not required, however, if the modification would be unreasonable or would work a fundamental alteration to the *nature* of the activity. Thus, the ADA demands that disabled persons be afforded reasonable modifications in accessing certain goods and services, unless the modification impacts the very nature of the activity itself. The ADA does not regulate the *content* of goods and services; it is only access to those goods and services that the ADA seeks to equalize for disabled persons.

We note that the great weight of judicial authority supports the conclusion that Title III of the ADA regulates access to goods and services provided by public accommodations, but does not regulate the content of

the goods or services provided. The decision in *PGA Tour, Inc.* v. *Martin*, supra, 532 U.S. 682–91, indicates that the United States Supreme Court has embraced this analytical distinction, albeit in a different context. In that case, the court concluded that a disabled golfer, in order to be afforded access to participate in tournaments, was entitled to a modification of the tournament rules that would allow him to employ a golf cart in order to traverse the course. The Supreme Court stated that "Title III of the ADA, by its plain terms, prohibits [the] petitioner from denying [the respondent] equal *access* to its tours on the basis of his disability." (Emphasis added.) Id., 677. Indeed, the court's conclusion that the petitioner was required under the ADA to permit a disabled golfer to use a golf cart during tournaments was predicated on its determination that such an accommodation merely provided access and did not fundamentally alter the nature or content of the game, which is "shot-making."[35] Id., 682–91.

The various Circuit Courts of Appeals generally have embraced this distinction between access and content in the more analogous context of insurance policies. In addition to the decision of the Seventh Circuit in *Mutual of Omaha Ins. Co.*,[36] the Second, Third, Fifth,

[35] The access and content distinction in the scope of Title III of the ADA also finds support in the regulations implementing the statute. For example, the ADA "does not require a public accommodation to alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities." 28 C.F.R. § 36.307 (a).

[36] "The common sense of the statute is that the content of the goods or services offered by a place of public accommodation is not regulated. A camera store may not refuse to sell cameras to a disabled person, but it is not required to stock cameras specially designed for such persons. Had Congress purposed to impose so enormous a burden on the retail sector of the economy and so vast a supervisory responsibility on the federal courts, we think it would have made its intention clearer and would at least have imposed some standards. It is hardly a feasible judicial function to decide whether shoe stores should sell single shoes to one-legged persons and if so at what price, or how many Braille books the Borders or Barnes and Noble bookstore chains should stock in each of their stores." *Doe* v. *Mutual of Omaha Ins. Co.*, supra, 179 F.3d 560.

Sixth and Ninth Circuits have all supported the distinction between access and content-based modifications in interpreting the ADA's regulation of insurance policies. See *Pallozzi* v. *Allstate Life Ins. Co.*, supra, 198 F.3d 28;[37] *Ford* v. *Schering-Plough Corp.*, 145 F.3d 601, 612 (3d Cir. 1998) ("[t]he fact that an insurance office is a public accommodation, however, does not mean that the insurance policies offered at that location are covered by Title III"), cert. denied, 525 U.S. 1093, 119 S. Ct. 850, 142 L. Ed. 2d 704 (1999); *McNeil* v. *Time Ins. Co.*, 205 F.3d 179, 186 (5th Cir. 2000) ("We believe that Title III prohibits the owner, operator, lessee, or lessor from denying the disabled access to, or interfering with their enjoyment of, the goods and services of a place of public accommodation. Title III does not, however, regulate the content of goods and services that are offered."), cert. denied, 531 U.S. 1191, 121 S. Ct. 1189, 149 L. Ed. 2d 106 (2001); *Parker* v. *Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1012 (6th Cir. 1997) ("Title III does not govern the content of a long-term disability policy offered by an employer"), cert. denied, 522 U.S. 1084, 118 S. Ct. 871, 139 L. Ed. 2d 768 (1998); *Weyer* v.

[37] We note that at least one observer has read *Pallozzi* as holding that the ADA regulates not just access to, but also the content of, a self-insured policy plan. See C. Olender, "Capping AIDS Benefits: Does Title III of the ADA Regulate the Content of Insurance Policies?," 28 Am. J.L. & Med. 107, 109 (2002). We do not read *Pallozzi* in a similar fashion. In *Pallozzi*, the plaintiffs claimed that the defendant insurance company had violated Title III of the ADA by refusing to sell them life insurance because of their mental disabilities. *Pallozzi* v. *Allstate Life Ins. Co.*, supra, 198 F.3d 29–30. The District Court dismissed the complaint for failure to state a claim. Id., 31. On appeal, the Second Circuit reversed, and concluded that Title III required the defendant "to provide disabled persons with physical access [to the company's offices and] also prohibited [the defendant] from refusing to sell them its merchandise by reason of their disability." Id., 33. We read this conclusion from *Pallozzi* as relating entirely to the Title III mandated efforts of an entity to make its facilities and goods or services *accessible and available* to the disabled. Thus, we see nothing in the *Pallozzi* decision indicating that the Second Circuit interpreted the ADA as governing the *content* of such goods or services.

*Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000) ("[w]e . . . hold that Title III does not address the terms of the policies that [an insurance company] sells").[38]

In light of these well reasoned opinions in the closely analogous factual context of insurance policies, we conclude that Title III of the ADA regulates a lender's provision of access to its mortgage loans, which are the goods and services that it offers, but does not regulate the content of those loan agreements. Thus, although a lender like the plaintiff may not refuse to provide equal access to its mortgage policies on the basis of the disabilities of potential mortgagors, it was not required to alter the otherwise universally applicable terms or conditions of its mortgage policies to accommodate the disabilities of borrowers such as the defendant. Thus, the reasonable modifications provision of

---

[38] We note the existence of, but in light of the more recent United States Supreme Court decision in *PGA Tour, Inc.* v. *Martin*, supra, 532 U.S. 682–91, have our doubts about the continued validity of the analysis by the First Circuit Court of Appeals in *Carparts Distribution Center, Inc.* v. *Automotive Wholesaler's Assn. of New England, Inc.*, 37 F.3d 12, 18–20 (1st Cir. 1994). In that case, the First Circuit declined to adopt the distinction, under the ADA, between access and content. The court stated that "[a]s a matter of bare language, one could spend some time arguing about whether this [language of the ADA] is intended merely to provide access to whatever product or service the subject entity may offer, or is intended in addition to shape and control which products and services may be offered. . . . [T]here is nothing in [the legislative history of Title III] that explicitly precludes an extension of the statute to the substance of what is being offered. Suppose, for example, a company that makes and distributes tools provides easy access to its retail outlets for persons with every kind of disability, but declines to make even minor adjustments in the design of the tools to make them usable by persons with only quite limited disabilities." Id., 19–20. Thus, the First Circuit concluded that Title III of the ADA governs not only access to certain goods and services, but may also regulate the content of such goods and services. "We think that at this stage it is unwise to go beyond the *possibility* that the plaintiff may be able to develop some kind of claim under Title III [with regard to the content of the benefits plan at issue] . . . ." (Emphasis in original.) Id., 20.

the ADA does not afford the defendant any relief in the present case.

The judgment is affirmed.

In this opinion BORDEN and KATZ, Js., concurred.

ZARELLA, J., with whom SULLIVAN, C. J., joins, concurring. I agree with the majority opinion but write separately to emphasize my agreement that principles of *comity*, i.e., the need to respect the legal principles of other jurisdictions, and *consistency*, i.e., the need for each jurisdiction to apply a uniform approach to the interpretation of a particular statute, dictate our adherence to the plain meaning rule in interpreting the federal statutes at issue in the present case. I also would emphasize that it does not violate principles of federalism or infringe on any prerogative of this court for this court to apply the plain meaning rule in interpreting federal statutes notwithstanding this court's rejection of the application of that rule in interpreting Connecticut statutes. See *State* v. *Courchesne*, 262 Conn. 537, 570, 577, 816 A.2d 562 (2003).

I also continue to maintain that it is regrettable that this court no longer follows the plain meaning rule in cases involving the interpretation of Connecticut statutes. See id., 597 (*Zarella, J.*, dissenting). The present case highlights yet another problem created by the abandonment of that rule. Specifically, the majority acknowledges that, in construing a Connecticut statute modeled on federal law, we are guided by federal case law, even when the federal court utilizes the plain meaning rule in construing the federal statute. The majority also concludes, however, that affording the state fair housing statutes at issue the same construction as that afforded to their federal counterparts by federal courts utilizing the plain meaning rule "is entirely compatible" with *Courchesne*—at least for purposes of the present

case—inasmuch as that construction is "consistent" with the construction that would be derived from gleaning the legislative history of the state fair housing statutes. Footnote 29 of the majority opinion. A case may well arise, however, in which the interpretation accorded a federal statute by federal courts will be inconsistent with the legislative history of an identical Connecticut statute. Under such circumstances, will this court continue to rely on federal case law applying the plain meaning rule in construing Connecticut statutes modeled on federal statutes, or will it revert to the purposive approach of *Courchesne*? In my view, either approach is problematic.