A. Michael MARQUES, in his capacity
as the Director of the Department
of Business Regulation[1]

v.

HARVARD PILGRIM HEALTHCARE
OF NEW ENGLAND, INC.

No. 2002–103–Appeal.

Supreme Court of Rhode Island.

Sept. 1, 2005.

1. The original named plaintiff in this case was Thomas Schumpert, in his capacity as the Director of the Department of Business Regulation (DBR). Since Mr. Schumpert is no longer the director, the case caption has been changed to reflect the name of the present office holder. *See* Rule 25(d) of the Superior Court Rules of Civil Procedure.

Thomas P. Seymour, pro se.

Brian J. Spero, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

PER CURIAM.

Thomas P. Seymour, appearing *pro se,* appeals from the denial of his motion for summary judgment and from the grant of summary judgment in favor of the appellee, Harvard Pilgrim Healthcare of New England, Inc. (HPHC–NE).[2] Relying

2. According to his Superior Court filings in the above-captioned matter, on February 14, 1997, Thomas P. Seymour filed a charge of discrimination against Harvard Pilgrim Healthcare of New England, Inc. (HPHC–NE) with the Rhode Island Commission for Human Rights (RICHR). Some time later, after the above-captioned action was commenced by the Director of the Department of Business Regulation, exclusive jurisdiction over Mr. Seymour's complaint vested in the Superior Court pursuant to the Insurers' Rehabilitation and Liquidation Act, G.L.1956 chapter 14.3 of title 27. When the director (in his capacity as the liquidator of HPHC–NE) later denied Mr. Seymour's claim, Mr. Seymour filed in the Superior Court a *pro se* "petition to appeal" that denial of his claim. It is the Superior Court's disposition of Mr. Seymour's appeal by way of summary judgment that is the subject of the present opinion.

Although it is the Director of the DBR, having been court-appointed as the liquidator of HPHC–NE, who technically is the appellee before us, we shall in the course of this opin-

upon Title III of the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101 *et seq.*,[3] Mr. Seymour contends that he was discriminated against on the basis of his disabilities when he was denied health insurance from HPHC–NE.[4]

## Facts and Travel

On August 16, 1995, Mr. Seymour requested that HPHC–NE send him an application form for health-care coverage,[5] and HPHC–NE duly mailed an application form to him.

On August 21, 1995, HPHC–NE received an application from Mr. Seymour, but its underwriting department determined that the application was incomplete because of the applicant's failure to provide certain information which it considered necessary. HPHC–NE returned the partially completed application to Mr. Seymour on the following day. In an accompanying letter, HPHC–NE explained its reasons for returning the application and informed Mr. Seymour that he was required to provide the additional information before it could consider his application for health-care coverage.

Over a month later, on September 30, 1995, HPHC–NE notified Mr. Seymour in writing that it had not yet received the previously requested obligatory information; and it informed him that, unless it received a completed application within two weeks, his partially-completed application would be voided and he would have to reapply for coverage. Mr. Seymour failed to respond within the specified two-week period. Accordingly, on October 15, 1995, HPHC–NE voided Mr. Seymour's partially-completed application.

In early December 1995, Mr. Seymour received a document entitled "Ten–Day Notice" from the Rhode Island Department of Human Services (DHS). The text of that notice informed Mr. Seymour that, after December 26, 1995, he would no longer be eligible to receive Medical Assistance (Medicaid) benefits due to his "[f]ailure to cooperate." The notice specified that Mr. Seymour had failed to provide the agency with documentation about a change in his financial situation.[6] The notice from

ion use the term "HPHC–NE" interchangeably with the terms "director" and "liquidator."

3. Title III of the Americans with Disabilities Act of 1990(ADA) prohibits "public accommodations" from discriminating against persons with disabilities. 42 U.S.C. § 12101 *et seq.* Our understanding of the meaning of the statutory term of art "public accommodations" is discussed *infra*.

4. Mr. Seymour's pleadings contain other claims (viz., alleged violations of his civil rights and statutory privacy rights). In view of our disposition of this appeal, however, we need not address those claims at this point in time.

5. It appears that, at that time, Mr. Seymour was receiving medical coverage from HPHC–NE through the Rhode Island Medical Assistance (Medicaid) program and wished to apply for coverage under HPHC–NE's "Personal Plan."

At the time, G.L.1956 § 27–41–42 (since repealed) prohibited the issuance of insurance policies that would limit or deny insurance coverage to those applicants who had a pre-existing condition; but the same statute also required that an applicant with a pre-existing condition have maintained continuous health-care coverage for the twelve months prior to the filing of an application for coverage. By obvious negative implication, the statute permitted the denial of coverage to those applicants with pre-existing conditions who had not maintained continuous health-care coverage during that twelve-month period.

The briefs filed on behalf of HPHC–NE refer to those applicants with the required prior insurance coverage as "conversion" applicants and to those who lacked such continuous coverage as "non-conversion" applicants.

6. Mr. Seymour admits that his Rhode Island Medical Assistance (Medicaid) coverage was terminated due to the fact that he had re-

DHS also informed Mr. Seymour that he had the right to request and receive a hearing. The ten-day notice document further informed him that, should he request a hearing within ten days, his Medicaid benefits would continue uninterrupted pending the outcome of the hearing. Mr. Seymour did not request a hearing. Accordingly, his Medicaid benefits were terminated on December 26, 1995.

Several weeks later, on February 12, 1996, Mr. Seymour contacted HPHC–NE to inquire about the status of his August 21, 1995 application for health-care coverage. HPHC–NE advised him that his application had been voided because he had failed to provide in a timely manner the additional information that was necessary for the application to be complete. It further advised Mr. Seymour that, should he still be interested in obtaining heath-care coverage from HPHC–NE, he would have to recommence the process by submitting a completed application.

On February 20, 1996, Mr. Seymour submitted a completed application to HPHC–NE. After reviewing the submitted materials, the underwriters at HPHC–NE concluded that Mr. Seymour presented an unacceptably high risk of loss due to the fact that he suffers from Arthrogryposis and Crohn's Disease.[7] As a result, on

February 27, 1996, HPHC–NE denied Mr. Seymour's application for health-care coverage because it had concluded that he did not meet its eligibility guidelines.

Mr. Seymour then filed a complaint with the Department of Business Regulation (DBR). The latter agency contacted HPHC–NE, and there was an exchange of correspondence between the two entities.[8]

On or about February 14, 1997, Mr. Seymour filed a charge of discrimination with the Rhode Island Commission for Human Rights (RICHR), asserting that HPHC–NE had discriminated against him because of his disability.[9]

Before the RICHR had taken any significant action with respect to this charge of discrimination, the director of the Department of Business Regulation (DBR) filed a petition for rehabilitation with respect to HPHC–NE on October 25, 1999, pursuant to G.L.1956 chapter 14.3 of title 27 (the "Insurers' Rehabilitation and Liquidation Act"). The petition for rehabilitation alleged that HPHC–NE was in an unsound financial condition, and it requested that the director of the DBR be appointed as the rehabilitator of HPHC–NE. An order to that effect was issued on the same day. On January 10, 2000, the director filed a petition for an order of liquidation. The

ceived an inheritance which rendered him financially ineligible to receive Medicaid.

7. Mr. Seymour suffers from Arthrogryposis Multiplex Congenita (Arthrogryposis) and Crohn's Disease. According to Mr. Seymour, Arthrogryposis is a disabling orthopedic impairment of the musculoskeletal system, which results in Mr. Seymour being substantially limited in one or more major life activities, including standing, walking, and self care. Crohn's Disease is a disorder of the digestive system, which also results in Mr. Seymour being substantially limited in one or more major life activities, including eating and self-care.

It is undisputed that the fact that Mr. Seymour suffers from Arthrogryposis and Crohn's Disease places him in a high risk insurance classification.

8. The record does not contain the actual complaint that was filed with the DBR. We do have, however, copies of subsequent letters between the DBR and counsel for HPHC–NE that were attached to the filings of the parties.

9. The actual charge (which he characterizes as a "complaint") that Mr. Seymour filed with the RICHR is not in the record before us; but Mr. Seymour's assertion that he did in fact file a charge with the RICHR is uncontested.

order was duly granted, and the director was appointed as the liquidator.

On May 19, 2000, a justice of the Superior Court enjoined any further action with respect to the charge of discrimination which Mr. Seymour had filed with the RICHR and which was then pending before that agency. Thereafter, Mr. Seymour filed a proof of claim with the liquidator. The proof of claim was denied on September 27, 2000. On November 1, 2000, Mr. Seymour, acting pursuant to § 27-14.3-43, filed in the Superior Court a petition to appeal the denial of his claim. In his petition, Mr. Seymour alleged that his civil rights and his state constitutional rights had been violated. He sought equitable relief as well as compensatory and punitive damages.

On May 9, 2001, Mr. Seymour filed a motion for summary judgment. The liquidator objected to the motion and filed a cross-motion for summary judgment. A justice of the Superior Court heard both motions on August 7, 2001; and, in a subsequent written decision, he denied Mr. Seymour's motion for summary judgment and granted the liquidator's cross-motion for summary judgment.[10] Final judgment was entered in favor of the liquidator pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure.[11] Mr. Seymour then filed a combined motion to amend the final judgment, to dismiss without prejudice and to grant a new trial. That combined motion was denied, and Mr. Seymour has timely appealed the final judgment to this Court.

## Standard of Review

 It is a basic principle that "[t]his Court reviews the granting of a motion for summary judgment on a *de novo* basis." *D'Allesandro v. Tarro*, 842 A.2d 1063, 1065 (R.I.2004); *see also DiBattista v. State*, 808 A.2d 1081, 1085 (R.I.2002). We will affirm a summary judgment "if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Rotelli v. Catanzaro*, 686 A.2d 91, 93 (R.I.1996).

 In this case, where both parties filed a motion for summary judgment, we will treat the relevant allegations of each party in the light most favorable to the nonmoving party, as each opposed the corresponding motion for summary judgment. *Pontbriand v. Sundlun*, 699 A.2d 856, 859 (R.I.1997).

 We have made it clear that "a litigant opposing a motion for summary judgment has the burden of proving by competent evidence the existence of a disputed issue of material fact * * *." *Santucci v.*

---

10. In denying Mr. Seymour's motion for summary judgment and in granting the liquidator's cross-motion for summary judgment, the motion justice observed that it was "undisputed that Seymour did not have continuous twelve (12) month coverage before his complete application was submitted * * *." The motion justice further noted that, except for Mr. Seymour's "feeling" that he had been discriminated against on the basis of his pre-existing conditions, Mr. Seymour admittedly had no evidence that he had been treated differently from those similarly situated with respect to the risk and hazard underwriting considerations employed by HPHC–NE. The hearing justice then found that Mr. Seymour had failed to establish a prima facie case of discrimination by HPHC–NE.

11. In view of the fact that its grant of summary judgment disposed of less than all of the pending claims in this case (although it did dispose of all of Mr. Seymour's claims), the court directed that final judgment enter pursuant to the provisions of Rule 54(b) of the Superior Court Rules of Civil Procedure, thereby enabling this appeal to proceed.

*Citizens Bank of Rhode Island,* 799 A.2d 254, 257 (R.I.2002); *see also Rotelli,* 686 A.2d at 93. As we discuss below, it is our opinion that Mr. Seymour has met that burden in opposing HPHC–NE's motion for summary judgment as it was framed at the time of the hearing in the court below. Certain genuine issues of material fact remain in dispute or at least do not appear with sufficient clarity in the record. Therefore, we are remanding this case to the Superior Court for further proceedings.

### Analysis

HPHC–NE contends before this Court, as it did below, that, in view of the express provisions of G.L.1956 § 27–41–42 (since repealed), HPHC–NE was legally entitled to deny Mr. Seymour's application for health-care coverage because the applicant did not have continuous health-insurance coverage for the twelve months that immediately preceded his application.[12] While we do not quarrel with the accuracy of HPHC–NE's reading of the Rhode Island statute, it is our opinion that, at least with respect to the factual situation that this case presently involves, the state statute was superseded by the provisions of Title III of the ADA.

■ At the pertinent time, the language of § 27–41–42, by obvious negative implication, permitted a health insurance provider to deny the issuance of a policy to applicants with a pre-existing condition who had not had continuous health-insurance coverage for the previous twelve-month period. It is clear to us, however, that Title III of the ADA mandates that both disabled and non-disabled persons should be provided with *equal access* to health insurance. It is also clear to us that § 27–41–42 restricts access to health insurance (by its twelve-month continuous coverage requirement) in a manner that adversely impacts those with pre-existing disabling conditions without impacting in a similar way those without such conditions.[13]

---

12. Section 27–41–42, provided as follows at the pertinent time:

> "Every individual * * * medical service plan contract delivered, issued for delivery or renewed in this state on or after January 1, 1996, shall not contain any clause that would limit coverage for any pre-existing condition, nor shall any such pre-existing condition be used as a basis for denying the issuance of a policy *for any individual who has been continuously insured or covered for the period of twelve months immediately prior to their date of application for insurance or coverage,* which previous insurance or coverage provided for the payment of benefits for the condition which is pre-existing."
> (Emphasis added.)

As noted above, it is undisputed that Mr. Seymour did not have continuous health-insurance coverage for the twelve months that immediately preceded his application to HPHC–NE for health-care coverage. It is also undisputed that, at all times relevant to this case, Mr. Seymour suffered from Arthrogryposis and Crohn's Disease.

13. We are not persuaded by our dissenting brother's argument that the McCarran–Ferguson Act, 15 U.S.C. § 1012 *et seq.,* completely bars the applicability of the ADA to this case. With all due respect for his analysis of the complex statutory schemes at issue, it appears to us that the ADA is a statute which "specifically relates to the business of insurance" (to use the language of 15 U.S.C. § 1012(b) of the McCarran–Ferguson Act). Pursuant to 15 U.S.C. § 1012(b) of the McCarran–Ferguson Act, federal statutes which *do* specifically relate to the business of insurance are not rendered nugatory by the provisions of the Act and therefore may supersede inconsistent state laws.

The ADA contains two fundamental provisions that specifically relate to the business of insurance. Those provisions are: (1) the "subterfuge" provision in 42 U.S.C § 12201(c), which prohibits insurance companies from using the safe harbor provision (discussed *infra* ) so as to evade the purposes of Titles I through III of the ADA; and (2) 42 U.S.C § 12181(7)(F), which includes an "in-

In view of the fact that Mr. Seymour's application for health-care coverage was completely denied, we will address in this opinion only the legitimacy of that complete denial of access to insurance. It will not be necessary for us to address at this time the issue of whether the provisions of Title III of the ADA extend beyond guaranteeing the right of access to the provider of insurance coverage to actually regulating (in whole or in part) the contents of the insurance policies themselves.

■ In order to establish a prima facie claim of discrimination pursuant to Title III of the ADA, it is well settled that the plaintiff bears the burden of proving:

"1) that he or she is an individual with a disability; 2) that defendant is a place of public accommodation; and 3) that defendant denied him or her full and equal enjoyment of the goods, services, facilities or privileges offered by defendant on the basis of his or her disability." *Larsen v. Carnival Corp.,* 242 F.Supp.2d 1333, 1342 (S.D.Fla.2003); *see also Schiavo ex. rel. Schindler v. Schiavo,* 358 F.Supp.2d 1161, 1165 (M.D.Fla.), *affd,* 403 F.3d 1289 (11th Cir.2005).

As we have previously noted, it is undisputed that Mr. Seymour suffers from Arthrogryposis and Crohn's Disease. At the hearing on the cross-motions for summary judgment, counsel for the liquidator acknowledged that Mr. Seymour's application had been denied on February 27, 1996, and he conceded that the application had been "denied because of an underwriting decision based on the risk associated with his disabilities." In view of this laudably candid concession, it is clearly undisputed that Mr. Seymour is a person with a disability for ADA purposes.

The next preliminary issue that must be addressed is whether or not HPHC–NE is a "place of public accommodation" within the meaning of Title III of the ADA. The pertinent mandate within the provisions of Title III of the ADA is the following:

"No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of *any place of public accommodation* by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). (Emphasis added.)

The numerous private entities that are deemed to be public accommodations for purposes of Title III of the ADA are itemized in great detail in 42 U.S.C. § 12181(7) of the statute; and an "insurance office" is specifically declared to be one of those public accommodations for the purposes of Title III.[14]

surance office" among the list of entities that are considered to be a "public accommodation" for purposes of Title III of the ADA.

When a federal statute specifically relates to the business of insurance (as does the ADA in our judgment), then the federal statute falls outside the reverse preemptive reach of the McCarran–Ferguson Act. *See Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 26, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996); *see also* Edward Caspar, *Doe v. Mutual of Omaha: Do Insurance Policy Caps on AIDS Treatments Violate the Americans with Disabilities Act?,* 75 Notre Dame L.Rev. 1535, 1554–55, 1559–63 (2000). Therefore, in our view, there is no reverse preemption of the ADA by state law in this case; and the ADA's anti-discrimination mandate may properly be invoked by Mr. Seymour—at least to the extent that he should have *access* to the insurance provider.

14. 42 U.S.C. § 12181(7) provides:

"The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce—

"(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not

In our judgment, the term "public accommodation" is not limited only to physical places. In *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.*, 37 F.3d 12, 15, 19 (1st Cir.1994), the United States Court of Appeals for the First Circuit, in reversing a grant of a Fed.R.Civ.P. 12(b)(6) motion to dismiss, held that the term "public accommodation," as used in Title III of the ADA, should not be limited to "actual physical structures." In support of that reading of the statute, the Court of Appeals took note of the "existence of * * * service establishments conducting business by mail and phone without providing facilities for their customers to enter in order to utilize their services." *Carparts Distribution Center, Inc.*, 37 F.3d at 19. The First Circuit went on to hold that "[t]he plain meaning of the terms [of the statute] do not require 'public accommodations' to have physical structures for persons to enter." *Id.* We are in agreement with the First Circuit's ruling in that case.

Our final preliminary determination is whether Mr. Seymour was denied, on the basis of his disability, the full and equal enjoyment of the services offered by HPHC–NE on the basis of his disability. In view of HPHC–NE's concession that Mr. Seymour's application was "denied because of an underwriting decision based on the risk associated with his disabilities," it is clear to us that HPHC–NE did in fact deny his application on the basis of his disability.

As indicated above, Title III of the ADA prohibits discrimination "by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Title III of the ADA further provides: "It shall be discriminatory to subject an individual * * * on the basis of a disability or disabilities of such individual * * * directly * * * to a denial of the opportunity of the individual * * * to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i).[15]

In view of the foregoing, we conclude that, as a private entity that offered health

more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

"(B) a restaurant, bar, or other establishment serving food or drink;

"(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

"(D) an auditorium, convention center, lecture hall, or other place of public gathering;

"(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

"(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, *insurance office*, professional office of a health care provider, hospital, or other service establishment;

"(G) a terminal, depot, or other station used for specified public transportation;

"(H) a museum, library, gallery, or other place of public display or collection;

"(I) a park, zoo, amusement park, or other place of recreation;

"(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

"(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

"(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation." (Emphasis added.)

**15.** *See also* Edward Caspar, 75 Notre Dame L.Rev. at 1539 n. 24 ("[A]n insurance company, as the 'person' who owns, leases, or operates an insurance office, falls under the purview of the ADA and may not discriminate against an individual on the basis of disability.").

insurance coverage, HPHC–NE was at the relevant time a public accommodation for purposes of Title III. HPHC–NE's complete and unequivocal refusal to offer Mr. Seymour an insurance policy constituted a denial of access. As we indicated above, that denial of access falls unequally upon those with pre-existing conditions as opposed to those without pre-existing conditions.[16]

We hold, therefore, that Mr. Seymour has satisfied his initial burden of proof and has established a prima facie claim of discrimination under Title III of the ADA.

Our analysis does not end at this point, however, because § 501(c) of Title V of the ADA, which is often referred to as the "safe harbor" provision, specifically exempts insurers from the regulatory scope of Title III if they meet certain conditions.[17] Thus, even though an insurer, as a public accommodation, is statutorily required to provide equal *access* to health insurance to both disabled and non-disabled persons, equality in terms of coverage may not be required if the insurer qualifies for an exemption under the "safe harbor" provision.

■ The "safe harbor" provision permits those insurers which are subject to the ADA to make otherwise discriminatory insurance decisions (including the denial of coverage) if those decisions are based upon either sound actuarial principles or reasonably anticipated experience. *Doukas v. Metropolitan Life Insurance Co.*, 950 F.Supp. 422, 429 (D.N.H.1996) (concluding that, to be protected by the safe harbor provision, "the insurance practice must either be based on actuarial data or on the company's actual or reasonably anticipated experience relating to the risk involved."); *see also Cloutier v. Prudential Insurance Co. of America*, 964 F.Supp. 299, 303 (N.D.Cal.1997). Where underwriting and classification of risks lack such a basis, the insurance practice impliedly fails to comply with the ADA. *Cloutier*, 964 F.Supp. at 303.

■ The allocation of the burdens of production and proof in civil litigation is often a function of which party has the better initial access to probative data. *See, e.g., Piquard v. City of East Peoria*, 887 F.Supp. 1106, 1125 (C.D.Ill.1995) ("In the health insurance context, the * * * insurer has control of the risk assessment, actuarial, and/or claims data relied upon in adopting the challenged disability-based distinction."). By contrast, a person who challenges a disability-based distinction usually has no access to such data. *Id.* In

16. Pursuant to § 27–41–42, (the state statute that was applicable at the relevant time), in order to avoid denial of his or her application, an applicant with a pre-existing condition must have had continuous health-insurance coverage for the previous twelve-month period. An applicant without a pre-existing condition, however, was not required to satisfy that criterion. The additional requirement that was imposed upon those with pre-existing conditions constituted, in our view, a denial of equal access in violation of the ADA.

17. Section 501(c) of Title V of the ADA, known as the "safe harbor" provision, provides in relevant part:

"[Titles] I through III of [the ADA] and title IV of [the ADA] shall not be construed to prohibit or restrict—

"(1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law * * *." 42 U.S.C § 12201(c).

The "safe harbor" provision also contains a so-called "subterfuge clause" that specifies that the just-cited statutory language "shall not be used as a subterfuge to evade the purposes of subchapter I and III of this chapter." *Id*

view of this consideration, it is our view that the burden-shifting approach that is usually followed in employment discrimination cases in federal court is appropriate in allocating the burdens of proof in claims brought under Title III of the ADA. *See Johnson v. Gambrinus Company/Spoetzl Brewery*, 116 F.3d 1052, 1059–60 (5th Cir. 1997); *Newman v. GHS Osteopathic, Inc. Parkview Hospital Division*, 60 F.3d 153, 157 (3rd Cir.1995); *see also Flasza v. TNT Holland Motor Express, Inc.*, 159 F.R.D. 672, 676–77 (N.D.Ill.1994); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Casey v. Town of Portsmouth*, 861 A.2d 1032 (R.I.2004).[18]

It should nevertheless be remembered that, despite this burden-shifting process, the plaintiff retains the ultimate burden of persuasion. *See Center for Behavioral Health, Rhode Island, Inc. v. Barros*, 710 A.2d 680, 685 (R.I.1998).

Because we have held that Mr. Seymour has established a prima facie case of discrimination under Title III of the ADA, the burden now shifts to HPHC–NE to show that its decision to completely deny Mr. Seymour's health coverage application was based upon either sound actuarial principles or reasonably anticipated experience. *Doukas*, 950 F.Supp. at 429.

In support of the cross-motion for summary judgment that was filed on behalf of HPHC–NE, the liquidator submitted the affidavit of Jeffrey Lieberman, a director of the PACE Group, Inc., which is located in Dallas, Texas. In his affidavit, Mr. Lieberman stated that his company had been "appointed as consultants and assistants to the Liquidator * * *." He also stated in the affidavit that he was the custodian of HPHC–NE's business records and that, based upon his personal knowledge and his review of those records, he was fully familiar with all of the facts and statements contained in his affidavit.

In paragraph nine of his affidavit Mr. Lieberman stated:

"[HPHC–NE]'s underwriting department, on or about February 27, 1996, reviewed the application and interviewed Seymour by telephone as to his health conditions and prior medical coverage. A true and accurate copy of the decision tree used to evaluate Seymour's application is attached hereto and incorporated herein by reference * * *. Thereafter, Seymour's application was denied based on the fact that he was ineligible for health care coverage due to the unacceptably high risk of loss presented by the health conditions he admits to suffer from, namely Crohn's Disease and Arthrogryposis."

The "decision tree" document that is referenced in and incorporated into Mr. Liebermans affidavit bears the following title: "Decision Tree for Rhode Island Pre–Existing Condition Legislation." The initials of two otherwise unidentified persons are to be found at the bottom of the document, next to the words "Underwriter # 1" and "Underwriter # 2."

---

18. In *Nicolae v. Miriam Hospital*, 847 A.2d 856 (R.I.2004), this Court summarized the burden-shifting mechanism in discrimination cases as follows:

"[T]he employee bears the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. If the employee proves a prima facie case, then the burden 'shifts to the employer to articulate some legitimate, nondiscrimina-tory reason for the employee's rejection.' * * * If the employer meets this burden, then the onus returns to the employee to show that the employer's legitimate reasons were mere pretext for discrimination. * * * '[T]o satisfy this third prong, a plaintiff must do more than simply cast doubt upon the employer's justification.'" *Id.* at 860.

The "decision tree" is basically a flow chart. At the beginning of the flow chart, the following question occurs: "Is there a PEC [pre-existing condition]?" In Mr. Seymour's case, the answer to that question was circled as "Yes."[19] An arrow then directed the user to consider a second question: "Did applicant have continuous coverage over the past 12 [months]?" For Mr. Seymour, the "No" answer was circled. Another arrow then directed the user to a statement that read: "May deny/limit coverage." Next to that statement the letter "D" (presumably meaning "deny") was handwritten and circled.

In a letter, dated February 27, 1996, HPHC–NE informed Mr. Seymour that it was denying his application because: "according to our eligibility guidelines, we cannot offer you membership. The specific reason is your history of Crohn's [D]isease and [A]rthrogryposis." HPHC–NE then stated: "Unfortunately, this condition represents a substantial insurance risk since it may eventually require significantly more than average care. * * * The underwriting guidelines that govern eligibility exclude risk groups who on average will need more health care than their premiums pay for."[20]

■■■ It is important to note, however, that HPHC–NE did not point to any specific evidence to support its conclusion that Mr. Seymour's high risk insurance classification justified a complete denial of his application for health-care coverage. *See Cloutier*, 964 F.Supp. at 305 ("The mere fact that a particular individual presents a greater risk does not compel the conclu-

sion that the individual presents an uninsurable risk."). The lack of evidence on this issue should have precluded the grant of summary judgment in favor of HPHC–NE, because there may be genuine issues of material fact as to whether the complete denial of coverage to Mr. Seymour was based upon sound actuarial principles or was related to HPHC–NE's actual or reasonably anticipated experience. *See Cloutier*, 964 F.Supp. at 303; *Doukas*, 950 F.Supp. at 429. By the same token, in light of the fact that these genuine issues of material fact have yet to be addressed, the denial of Mr. Seymour's motion for summary judgment was appropriate.

Accordingly, we hold that HPHC–NE violated the ADA when it refused to grant Mr. Seymour any access whatsoever to health insurance. Further proceedings will be necessary to determine what coverage he might be entitled to.[21]

**Conclusion**

For the foregoing reasons, we affirm in part and reverse in part the judgment of the Superior Court. We affirm the denial of Mr. Seymour's motion for summary judgment. We reverse the grant of summary judgment in favor of HPHC–NE. The record may be remanded to the Superior Court so that HPHC–NE may be afforded an opportunity to attempt to demonstrate that its denial of health-insurance coverage was based on sound actuarial principles or that its decision was related to actual or reasonably anticipated experience. Should HPHC–NE succeed in so doing, the burden would then shift back to

---

**19.** If the answer to that question had been circled as "No," the user of the "decision tree" would have been instructed to "Proceed with the enrollment process."

**20.** Furthermore, as observed above, counsel for the liquidator conceded at the summary judgment hearing that Mr. Seymour's appli-

cation was denied because of an underwriting decision based on the risk associated with his disabilities.

**21.** After further development of the factual record, it may still be possible to resolve this case through the mechanism of Rule 56 of the Superior Court Rules of Civil Procedure.

Mr. Seymour, who would have to prove that HPHC–NE's articulated reasons for the denial were, in fact, a "subterfuge" (*see* note 17 *supra*) to evade the purposes of Title III of the ADA.

ROBINSON, J., dissenting.

I respectfully disagree with the majority's understanding of certain of the pertinent statutes, and therefore I must dissent. In my judgment, the express provisions of the McCarran–Ferguson Act, 15 U.S.C. § 1011 et seq., render the ADA inapplicable to this case.

My analysis is guided in large measure by what I consider to be the powerful logic and the unflinching approach to statutory construction that is reflected in the decision of the Seventh Circuit in the case of *Doe v. Mutual of Omaha Insurance Co.,* 179 F.3d 557 (7th Cir.1999) (Posner, J.). While I have carefully considered the decisions of other courts that have reached a different result, the Seventh Circuit's understanding of the McCarran–Ferguson

Act and of its applicability in the ADA context has remained persuasive for me.

After considering the rather voluminous legal authorities (case law and scholarly writings) that deal with this issue, I am convinced (1) that Congress has spoken quite definitively in the McCarran–Ferguson Act; (2) that said Act bars the application of the ADA to insurance coverage cases like this one; and (3) that there is no legally defensible way to circumvent that clear congressional directive.

The McCarran–Ferguson Act, 15 U.S.C. § 1011 et seq., is a federal statute that mandates that, under most circumstances, the individual states rather than the federal government shall regulate the business of insurance. 15 U.S.C. § 1012(b) of the Act provides in pertinent part as follows:

> "No Act of Congress shall be construed to invalidate, impair, or supersede *any* law enacted by any State for the purpose of regulating the business of insurance * * * unless such Act specifically relates to the business of insurance * * *." (Emphasis added.) [22]

**22.** In a non-ADA case that preceded its decision in *Doe v. Mutual of Omaha Insurance Co.,* 179 F.3d 557 (7th Cir.1999), the Seventh Circuit emphasized the vastly preemptive reach of the McCarran–Ferguson Act and noted that, unlike the rather common situation where federal law preempts state law, the McCarran–Ferguson Act requires that there be in effect a *reverse preemption* in most situations where federal and state statutes regulating the business of insurance coincide:

> "Congress intended the McCarran Act to allow the states to regulate the business of insurance 'free from inadvertent preemption by federal statutes of general applicability.' * * * To this end, Congress reversed the standard rules for preemption, creating a 'clear statement rule * * * that state laws enacted "for the purpose of regulating the business of insurance" do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise.' " *Autry v. Northwest Premium Services, Inc.,* 144 F.3d 1037, 1040 (7th Cir. 1998) (quoting *Merchants Home Delivery*

*Service, Inc. v. Frank B. Hall & Co.,* 50 F.3d 1486, 1488–89 (9th Cir.1995) and *United States Department of Treasury v. Fabe,* 508 U.S. 491, 507, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993)).

It is interesting to note that the reverse preemptive effect of the McCarran–Ferguson Act does not always act to the detriment of consumers or applicants for insurance coverage. The McCarran–Ferguson Act was enacted in order to leave "the business of insurance" to the several states, and the states are sometimes motivated by pro-consumer sentiments in carrying out their regulatory function. *See, e.g., Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (upholding on McCarran–Ferguson grounds a state's mandated-benefit program); *New Hampshire–Vermont Health Service v. Whaland,* 119 N.H. 886, 410 A.2d 642, 646 (1979) (upholding on McCarran–Ferguson grounds a state mandate that health insurers must provide coverage for mental illnesses).

The courts have almost universally recognized the broad reach of the McCarran–Ferguson Act.[23] *See, e.g., Mutual of Omaha Insurance Co.,* 179 F.3d at 564 (noting that "[s]tate regulation of insurance is comprehensive and includes rate and coverage issues" and explaining that the McCarran–Ferguson Act forbids construing a federal statute in a manner that would result in federal regulation of those state regulatory functions).

In other words, because of Congress's clear option in the McCarran–Ferguson Act in favor of state rather than federal regulation of insurance, it has become black letter law that "federal laws should not be construed to supersede state laws 'regulating the business of insurance.'" *Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. 724, 736, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (quoting 15 U.S.C. § 1012(b)).[24] The United States Supreme Court has indicated that Congress understood the term "business of insurance" in the McCarran–Ferguson Act, to refer to "the underwriting and spreading of risk." *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 220–21, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979);[25] *see also Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119, 127–28, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). In my view, the Rhode Island statute at issue in this case certainly deals with "the underwriting and spreading of risk."

The Congressional mandate in McCarran–Ferguson is so strong that it results in a virtual *presumption* that Congress has left the core of the insurance field to state regulation unless another federal statute clearly indicates that it "specifically relates" to the business of insurance. *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 40–41, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (interpreting the "specifically relates" language in the Act to refer to instances where "Congress had focused upon the insurance industry, and therefore, in all likelihood, consciously intended to exert upon the insurance industry whatever preemptive force accompanied its law"); *see also United States Department of Treasury v. Fabe,* 508 U.S. 491, 507, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993).

In his opinion in *Kachanis v. United States,* 844 F.Supp. 877 (D.R.I.1994), Judge Pettine succinctly and usefully summarized the holdings of several courts as to the criteria to be followed in determining whether or not the McCarran–Ferguson Act is applicable in a particular context. Pursuant to the three-part analytical approach suggested by Judge Pettine, a court faced with deciding whether the McCarran–Ferguson Act prevents another

**23.** *See Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 40–41, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (tracing the history of the McCarran–Ferguson Act); *Kachanis v. United States,* 844 F.Supp. 877 (D.R.I.1994) (describing the genesis of the McCarran–Ferguson Act); *see also United States Department of Treasury v. Fabe,* 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993).

**24.** It goes without saying that the wisdom (*vel non*) of the decision made by Congress in enacting the McCarran–Ferguson Act should play no role in judicial construction of that statute. *See United States v. Great Northern*

*Railway Co.,* 343 U.S. 562, 575, 72 S.Ct. 985, 96 L.Ed. 1142 (1952) ("It is our judicial function to apply statutes on the basis of what Congress has written, not what Congress might have written.").

**25.** In *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 215, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), the Supreme Court specifically noted that "the contract between the insurer and the insured" constitutes "[a]nother commonly understood aspect of the business of insurance."

piece of federal legislation from affecting the business of insurance should:

(1) Determine whether the federal statute at issue "specifically relates to the business of insurance within the meaning of [15 U.S.C. § ] 1012b." *Kachanis,* 844 F.Supp. at 880. (If the federal statute does specifically relate to the business of insurance, then McCarran–Ferguson does not bar it.)

(2) Determine whether the state statute at issue was " 'enacted for the purpose of regulating the business of insurance.' " *Id.* at 881.

(3) Determine whether the federal statute at issue "would 'invalidate, impair, or supersede state law.' " *Id.*

It is my considered judgment that the ADA does not "specifically relate" to the business of insurance. The focus of the ADA is very wide, and I do not see how it can fairly be said to constitute the specific regulation of the business of insurance. *See Doe v. Mutual of Omaha Insurance Co.,* 179 F.3d 557 (7th Cir.1999). Accordingly, it is clear to me that the McCarran–Ferguson Act renders the ADA inapplicable to insurance coverage issues; and, therefore, I need not address the remaining parts of the *Kachanis* analytical scheme.

Although the ADA does make some brief reference to insurance, it is my view that it is a general law dealing with a vast array of matters, and I am unable to see how it can be read as relating specifically to the business of insurance. *See Humana, Inc. v. Forsyth,* 525 U.S. 299, 306–07, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) ("Section 2(b) [of the McCarran–Ferguson Act] provides that when Congress enacts a law specifically relating to the business of insurance, that law controls. * * * [Section 2(b)] further provides that federal legislation general in character shall not be 'construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance.' ").[26] It is clear to me that the ADA is "federal legislation general in character." *Humana, Inc.,* 525 U.S. at 306, 119 S.Ct. 710. Accordingly, since the McCarran–Ferguson Act allows state law to have a reverse preemptive effect when the federal statute at issue is "general in character," I do not believe that the ADA is applicable to the subject of insurance coverage.

The most notable reference to insurance in the ADA is its "safe-harbor" provision (42 U.S.C. § 12201(c)), pursuant to which an insurer can avoid liability under the ADA if its decision "is consistent with state law and not a subterfuge to evade the purposes of the ADA." *See Boots v. Northwestern Mutual Life Insurance Co.,* 77 F.Supp.2d 211, 219 n. 8 (D.N.H.1999) (paraphrasing the provisions of 42 U.S.C. § 12201(c)). I view the ADA's safe harbor language as being a statutory provision that facilitates and protects traditional insurance industry practices; it is not at all a provision that constitutes the specific regulation of the business of insurance. Its evident purpose is to further insulate the insurance industry from the reach of the ADA; its thrust is not regulatory.[27]

**26.** Section 2(b) of the McCarran–Ferguson Act is codified at 15 U.S.C. § 1012(b).

**27.** In addition, the ADA also includes "insurance office" among the numerous itemized places that are statutorily deemed to constitute a public accommodation. 42 U.S.C. § 12181(7)(F). In my view, however, that provision relates solely to physical access.

*See, e.g., Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104, 1115 (9th Cir.2000) ("Although Title III of the ADA requires an insurance office to be physically accessible to the disabled, it does not address the terms of the policies the insurance companies sells."). In my judgment, 42 U.S.C. § 12181(7)(F) has no bearing on rate or coverage issues. *See*

Given my view that the ADA is entirely inapplicable to this case, I need not comment upon what the ADA would require if its applicability to this case were not barred by the McCarran–Ferguson Act. Nevertheless, I wish to indicate my view that, even if the ADA were applicable, I would not be inclined to construe Title III as regulating the contents of the goods and services that are made available or rendered. I would be inclined to agree with those appellate courts that have held that Title III does not apply to the contents of insurance policies. *See, e.g., McNeil v. Time Insurance Co.,* 205 F.3d 179, 186 (5th Cir.2000); *Ford v. Schering–Plough Corp.,* 145 F.3d 601, 612–13 (3rd Cir.1998); *Parker v. Metropolitan Life Insurance Co.,* 121 F.3d 1006, 1010–12 (6th Cir.1997); *Webster Bank v. Oakley,* 265 Conn. 539, 830 A.2d 139, 161 (2003), cert. denied, 541 U.S. 903, 124 S.Ct. 1603, 158 L.Ed.2d 244 (2004); *see also* Lori Block Izzo, *Doe v. Mutual of Omaha Insurance Co.: The ADA Does Not Regulate the Content of Insurance Policies, But What Have Cameras, Braille Books or Wheelchairs Got to Do With it?* 7 Conn. Insurance L.J. 263, 310 n. 254 (2000–2001) ("After the decision in *Doe v. Mutual of Omaha,* the Fifth and Ninth Circuits joined the Sixth and Third Circuits, rejecting the argument that Title III of the ADA regulates the content of insurance policies."); *see generally* Luke A. Sobota, *Does Title III of the Americans with Disabilities Act Regulate Insurance?,* 66 U. Chicago L.Rev. 243 (1999).[28] As I read the ADA, it does not even remotely prohibit the traditional risk-assessment process in which the insurance industry has engaged for centuries.

To return to the main focus of this dissent, I wish to reiterate that I am convinced that a clear congressional statute (the McCarran–Ferguson Act) prevents the ADA from being applicable to this case. Therefore, I respectfully dissent.

---

*SEC v. National Securities, Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) ("Statutes aimed at protecting or regulating [the relationship between the insurance company and the policy holder], directly or indirectly, are laws regulating the 'business of insurance.' ").

**28.** But see *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.,* 37 F.3d 12 (1st Cir.1994).

It is important to bear in mind that the First Circuit's decision in *Carparts,* considered and ultimately reversed the trial court's dismissal of a complaint pursuant to a motion that defendant had filed under Fed.R.Civ.P. 12(b)(6). In view of that procedural context, it goes without saying that the First Circuit's ruling in *Carparts* is far from definitive. *See*

*Carparts,* 37 F.3d at 20 ("We think that at this stage it is unwise to go beyond the possibility that the plaintiff may be able to develop some kind of claim under Title III * * *. Not only the facts but, as we have already noted, even the factual allegations are quite sparse.").

It should also be noted that the Supreme Court of our neighboring state of Connecticut has recently expressed its "doubts about the continued validity of the analysis by the First Circuit Court of Appeals in *Carparts* * * *." *Webster Bank v. Oakley,* 265 Conn. 539, 830 A.2d 139, 162 n. 38 (2003). The basis for the Connecticut court's doubts was the United States Supreme Court's decision in *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001).